

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-2-2009

# AstenJohnson Inc v. Columbia Cslty Co

Precedential or Non-Precedential: Precedential

Docket No. 07-2305

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"AstenJohnson Inc v. Columbia Cslty Co" (2009). *2009 Decisions.* Paper 1450.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1450

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

NO. 07-2305

———————

ASTENJOHNSON, INC.

                                    Appellant

v.

COLUMBIA CASUALTY COMPANY;
AMERICAN INSURANCE COMPANY

———————

On Appeal From the United States
District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 03-cv-01552)
District Judge:  Hon. Lawrence F. Stengel

———————

Argued October 30, 2008

BEFORE:  SLOVITER, STAPLETON and
TASHIMA,* *Circuit Judges*

———————

* Hon. A. Wallace Tashima, Senior United States Circuit Judge
for the Ninth Circuit, sitting by designation.

(Opinion Filed: April 2, 2009)

Robert C. Heim (Argued)
Nory Miller
John S. Ghose
Dechert
2929 Arch Street
Cira Centre - 18th Floor
Philadelphia, PA  19104
  and
John N. Ellison
Reed Smith
1650 Market Street
2500 One Liberty Place
Philadelphia, PA  19103
  and
Michael Conley
Anderson, Kill & Olick
1600 Market Street - Suite 2500
Philadelphia, PA  19103
  Attorneys for Appellant

Ronald P. Schiller (Argued)
Jay I. Morstein
Nicole J. Rosenblum
DLA Piper
One Liberty Place - Suite 4900
1650 Market Street
Philadelphia, PA  19103
  Attorneys for Appellee
  Columbia Casualty Company

2

Steven A. Cozen (Argued)
Jacob C. Cohn
Cozen & O'Connor
1900 Market Street - 3rd Floor
Philadelphia, PA 19103
  Attorneys for Appellee
  American Insurance Cpmpany

Andrew M. Roman
Richard A. Ejzak
Cohen & Grigsby
11 Stanwix Street - 15th Floor
Pittsburgh, PA 15222
  and
Amy Bach
United Policyholders
11 Pacific Avenue – No. 262
San Francisco, CA 94111
  Attorneys for Amicus Curiae
  United Policyholders

---

OPINION OF THE COURT

---

STAPLETON, Circuit Judge:

Appellant AstenJohnson, Inc. ("Asten"), manufactured asbestos dryer felts and other materials used in the paper

3

industry. Appellees Columbia Casualty Company ("Columbia") and American Insurance Company ("American") issued $52 million of comprehensive liability insurance to Asten in 1981 and 1982. These policies contained an exclusion from coverage for any claim alleging "an exposure to or the contracting of asbestosis" ("the Asbestosis Exclusion Clause"). Both Columbia and American have denied coverage under this exclusion for all asbestos-related bodily injury claims. Asten here seeks, *inter alia*, a declaratory judgment that its coverage under these policies includes all claims related to asbestos exposure other than those involving the fibrotic lung disease, asbestosis. After a three-week bench trial, the District Court denied Asten the declaratory relief sought. The primary issues before us are whether Asten was entitled to a jury trial under the Seventh Amendment, and whether the District Court's resolution of the coverage issue should stand.

## I. Background
### A. The Policies At Issue ("the Subject Policies)
#### 1. Columbia Policies
##### a. April 1, 1981, to April 1, 1982, Policy Period

Columbia sold Asten a one-year primary-layer comprehensive general liability insurance policy covering the period between April 1, 1981, and April 1, 1982 ("1981 Columbia Primary Policy"). The policy provided occurrence/aggregate limits of $1,000,000 and had a $2,500 per claim deductible. Columbia also sold Asten an excess third-party liability policy for this period, which provided occurrence/aggregate limits of $10,000,000 ("1981 Columbia Excess Policy").

4

### b. April 1, 1982, to October 1, 1983, Policy Period

Columbia sold Asten a comprehensive liability policy for the eighteen-month period between April 1, 1982, and October 1, 1983, providing occurrence/aggregate limits of $1,000,000 and having a $2,500 per claim deductible ("1982 Columbia Primary Policy"). Columbia also sold Asten an excess third party liability policy providing per occurrence/aggregate limits of $10,000,000 ("1982 Columbia Excess Policy"). The policy was in excess to the limits set forth in the underlying American policy.

### c. Terms of the Columbia Policies

The Columbia policies contain the following "exclusion":

It is agreed that this policy does not apply to any claim alleging an exposure to or the contracting of asbestosis or any liability resulting therefrom.

It is further agreed that this policy does not apply to any claim arising out the Insured's membership in the Asbestos Textile Institute.

AI0053. "Asbestosis" was not defined in any of the policies.

The primary policies contained a notice provision, stating in relevant part that "[i]n the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information . . . shall be given . . . as soon as practicable." AI0054. The excess policies also

5

contained a provision stating that notice shall be given "as soon as practicable."  AI0054.

## 2.  American Policies
### a.  The 1980 Policy Period

In 1980, American sold Asten a blanket excess policy with $10,000,000 in annual indemnity limits, excess to a $1,000,000 primary policy issued by Argonaut Insurance Company.  The 1980 policy did not contain an asbestos-related exclusion.  The 1980 American Policy contained a products liability endorsement, however, which stated that the policy did not apply except insofar as "coverage is available to the insured under primary policies."  AI0055.

### b.  April 1, 1981, to April 1, 1982, Policy Period

For the annual period beginning April 1, 1981, American sold Asten a blanket excess liability policy ("1981 American Umbrella Policy") with a $10,000,000 annual indemnity limit, excess to the $1,000,000 1981 Columbia Primary Policy.  This policy contained no asbestos-related language, but provided a product liability endorsement which indicated that the policy did not apply unless coverage was available under the Columbia Primary Policy.  It further contained a notice provision, which stated that "[w]hen an occurrence takes place which is reasonably likely to give rise to a claim under this policy" notice shall be provided "as soon as practicable" to the company.  AI0056.

### c.  April 1, 1982, to October 1, 1983

6

For the eighteen-month period beginning April 1, 1982, American sold Asten a blanket excess liability coverage ("1982 American Umbrella Policy") that was substantially identical to the 1981 American Umbrella Policy. The relevant notice portion of the policy stated that "[t]he Insured shall immediately advise the company of any occurrence or disaster which will probably result in liability under this Policy." AI0059.

American also sold to Asten an additional blanket excess liability policy for the policy period April 1, 1982, to October 1, 1983 ("1982 American Excess Policy"). The American Excess Policy had liability limits of $10,000,000, excess to the underlying limits contained in the 1982 American Umbrella Policy and the 1982 Columbia Excess Policy.

## B. Pretrial Proceedings.

Asten's March 13, 2003, complaint asserted three claims relating to its asbestos litigation which it describes as claims for "legal relief": declaratory judgment claims against Columbia and American and a breach of contract claim against Columbia. It insists that the District Court improperly denied it a jury trial on these claims.

Count I, containing the "declaratory judgment" claims, alleged that Columbia and American had refused to honor their obligations under the insurance contracts and asked, *inter alia*, for a declaration that Asten was entitled to have Columbia and American "reimburse AstenJohnson for, or pay on behalf of AstenJohnson, any and all judgments or settlements reached in the Underlying Actions, until such time as the total aggregate

7

limits of each of the foregoing insurance policies have been exhausted." AV0231. The "Underlying Actions" were asbestos-related suits filed against Asten as of the filing of the complaint. Count I also sought a declaratory judgment with respect to the aggregate limits of liability under American's 1982 Umbrella and Excess Policies and with respect to American's duty to pay defense costs under its 1982 Excess Policy.

Count II alleged a "breach of contract" claim against Columbia for refusing to defend and indemnify Asten for certain asbestos-related claims that had been tendered to it in the Fall of 2001. It asks for "an award requiring Columbia . . . to pay . . . all monetary damages suffered" by Asten. AV0233.

After the close of discovery and in anticipation of the final pre-trial conference on January 23, 2006, and the then scheduled January 30, 2006, trial, the parties were required by local rule to file pre-trial memoranda including "a list of every item of monetary damage claimed, including (as appropriate) computations." Asten's pre-trial memorandum contained no itemization or computation of the money damages it had thus far suffered and identified no expert witnesses who intended to testify about those damages. At the pre-trial conference, Asten's counsel was unable to articulate in response to the Court's direct questions what damages Asten had suffered. As a result, Columbia and American filed motions to strike Asten's jury demands.

The trial was delayed and the motions to strike were not heard until June 20, 2006, four months after their filing. Prior

to that hearing, Asten tendered no description of the damages it sought or the evidence it proposed to introduce in support of its damage claim. At the hearing, Asten's counsel acknowledged to the Court that Asten had not yet suffered "out-of-pocket" losses because it had "had its other carriers pay" to defend and indemnify it. When asked what Asten would be asking the jury to award it, the response was as follows:

> THE COURT: What will you be asking the jury to award to you?
>
> MR. ELLISON: We'll be asking the jury to award us the amount of insurance we have had to use up in pre-1981 coverage, that is coverage that had to be used for non-asbestosis claims, that was – that we were required to use or needed to use because the coverage that was available under the Columbia policy was wrongfully denied to us and – and same with American.
>
> THE COURT: And what's that amount?
>
> MR. ELLISON: That amount, Your Honor, is – is millions of dollars. I – I don't know the exact number. Mr. Young and Mr. Gibson both have firsthand knowledge of – of that process.
>
> THE COURT: Well, you're – you're ten days from trial and you can't tell me what number you're going to ask the jury to award to you?

MR. ELLISON:  I – I can tell you it's millions of dollars.  The burn rate over the last couple of years has been about $2 million a year in coverage that they have used up.

THE COURT:  So, on the jury interrogatory where – where we say to the jury, what amount do you award to the plaintiff, you want them to write in millions of dollars?

MR. ELLISON:  No, it will be six – roughly $6 million.

AV0306-07.  There was no further tender of evidence of damages by Asten prior to or at trial.

## C.  The District Court's Decisions

The District Court granted the motion to strike Asten's jury demand.  It noted that the Seventh Amendment right to a jury trial "attaches to actions at law, but not actions in equity," AII0006, and that in its analysis it was required to look to the substance of a claim rather than the labeling used by the party asserting it.  Because Asten as of two weeks prior to trial had tendered no competent evidence that recoverable damage had yet been suffered by Asten and because "resultant damages" were an essential element of a cause of action for breach of contract under Pennsylvania law, the Court concluded that the breach of contract claim did not require a jury trial.  It then held that Asten's remaining claims were equitable and, accordingly, that a bench trial was appropriate.

10

Following a three-week bench trial, the District Court found that the parties had intended the exclusion clause to exclude all asbestos-related cases. It recognized that asbestosis was a specific respiratory disease caused by inhaling asbestos fibers. It noted, however, that read literally the phrase "exposure to asbestosis" would only exclude liability for someone alleging that he or she was harmed by being exposed to a person with a non-communicable disease. The Court therefore declined to attribute to the parties the literal meaning of the text without considering the other permissible aids to contract interpretation under Pennsylvania law – *i.e.*, trade usage, the performance of the parties, and the situation and negotiations providing context for the parties' original agreement. "[I]nformed by the usage of trade, usage of the parties, and the course of performance of the parties," the Court concluded that the asbestosis exclusion "len[t] itself to only one interpretation . . . [– *i.e.* it] was intended by the parties to exclude from coverage all claims deriving from the exposure to Asten's asbestos-containing products." AI0142.

The District Court also held (1) that Asten's declaratory judgment claim against Columbia, although not its claim against American, was barred by laches; and (2) that the defendants were entitled to reformation of the exclusion clause to clearly exclude all asbestos-related claims. Finally, the Court ruled (3) that the one-year aggregate liability limit applied to the entire 18 months of each of American's 1982 policies; and (4) that American's excess policies did not impose a duty to defend or pay defense costs. The Court declined to reach the defendants' defense that Asten was barred from relief by its failure to comply with the notice provisions of the policies.

11

## II.  Declaratory Judgment as a Matter of Law

Asten insists that the exclusion clause is unambiguous, that the District Court improperly considered anything other than the text of that clause, that there are no material disputes of fact, and that it is entitled to the declaratory judgment it seeks as a matter of law.  We cannot agree.

The District Court properly considered the extrinsic evidence which it did.  Pennsylvania law follows the Restatement approach to the interpretation of written, integrated contracts.  *Sunbeam Corp. v. Liberty Mutual Ins. Co.*, 566 Pa. 494, 781 A.2d 1189 (Pa. 2001);  Restatement (Second) of Contracts § 202 (1981), *et seq*.  Parol evidence cannot be used to contradict the provisions of such a contract.  In determining whether such a contradiction would occur, however, the text of the contract must first be interpreted in light of any evidence of trade usage and the performance of the parties under the contract.  *Sunbeam*, 781 A.2d at 1193.  If after the consideration of such evidence, the intent of the parties remains unclear, evidence concerning the pre-contract negotiations of the parties may also be considered in reaching a conclusion concerning the intention of the parties.  *Resolution Trust Corp. v. Urban Redev. Auth. of Pittsburgh*, 536 Pa. 219, 225-26, 638 A.2d 972, 975-76 (Pa. 1994).

The District Court first found, based on expert testimony and the testimony of Asten's procuring agent, Gloria Forbes, that in the insurance world of the 1980s "the term 'asbestosis' was used to mean two different things.  First, the term was used to mean the specific asbestos-related disease discussed above

12

and found in a medical dictionary. Second, it was used as a generic term, *i.e.*, an all encompassing term that includes all asbestos-related diseases." AI0138. The District Court next looked to the course of performance, finding that "Asten's course of performance over the twenty plus years after the execution of the Subject Policies is the most compelling evidence of the intention of the parties." AI0130. In the view of the Court, that evidence "clearly demonstrates that Asten understood and intended the Asbestosis Exclusion to bar all claims alleging any asbestos-related disease." *Id.*

Only after these conclusions did the District Court turn to the circumstances surrounding the entering of the policies. At that point, there was clearly sufficient doubt about the literal reading of the text to warrant consideration of parol evidence. Based on the parol evidence, the Court found that the "April 2, 1981 communication between DVUA and Babb, agents for Columbia and Asten respectively, reflect[ed] a meeting of the minds," AI0138, that all asbestos-related claims would be excluded. The Court further concluded that the circumstances surrounding the issuance of the policies strongly suggested that the exclusion was not intended to exclude liability for asbestosis only. As the Court put it:

> Given the nature of the underlying complaints in the early 1980s, where plaintiffs often would allege an asbestosis injury along with other asbestos-related injuries, the Asbestosis Exclusion that only applied to the specific disease asbestosis would offer an insurance company very little protection. That is because under Pennsylvania

13

law, an insurer excluding just asbestosis claims would still be required to defend any asbestos lawsuit alleging asbestosis and any other of the diseases that result from exposure to asbestos. The insurer's duty to defend would only be relieved if the claimant's disease was narrowed down to asbestosis only. And if the diagnosis could never be narrowed down to exclude all disease but asbestosis, the insurer would have to indemnify as well.

\* \* \*

And both Asten and Columbia were well aware of this. As it learned in Canada, Asten knew it would not be able to acquire coverage for asbestos-related claims. Asten manufactured asbestos and its exposure to asbestos liability had begun prior to 1981. Columbia knew Asten's history and it expressed to Asten's agent its desire to exclude all asbestos-related claims.

AI0139 (footnote omitted); AI0141.

As we have indicated, we find no fault with the District Court's consideration of evidence beyond the text of the policies. Asten's primary arguments to the contrary are: (1) that the text of the asbestosis exclusion is not ambiguous, and (2) that consideration of evidence indicating trade use of "asbestosis" as a catchall for asbestos-related disease was improper because it was not shown to be "continuous, uniform,

14

and notorious." We address those arguments in turn.

Asten points to dictionary definitions of "exposure" which include the act of being open to something that poses a danger or risk. Based on this definition, Asten insists that "exposure to asbestosis" in the context of the contractual language "exposure to or contracting of asbestosis" unambiguously means "exposure to the risk of contracting asbestosis." Asten's interpretation equates exposure to the asbestosis disease with the risk of contracting that disease. However, as noted by the District Court, these are separate and distinct harms. The District Court, employing the dictionary definition relied upon by Asten, pointed out that someone exposed to the asbestosis disease runs no risk of contracting that disease. While Asten's suggested interpretation under some circumstances might be a permissible one, it does not render "exposure to asbestosis" unambiguous. Moreover, as we have indicated, under Pennsylvania law, the District Court would be entitled to consider trade usage and party performance even if Asten's suggested reading were consistent with a literal reading of the text of the exclusion.

Asten further argues that the District Court improperly considered the trade usage evidence that "asbestosis" was commonly used in the insurance world in the early 1980s to refer to all asbestos-related diseases. In support of this argument, Asten points to (1) evidence that those in the industry regularly used "asbestosis" to mean the specific disease, (2) evidence that 1981 policies issued by others broadly excluded all asbestos-related diseases without using "asbestosis" as shorthand for the broad exclusion, and (3) the fact that the

15

defendants' trade usage evidence did not include other policies in which "asbestosis" was used to mean asbestos-related diseases. As we read Pennsylvania law, however, to be an interpretation aid, trade usage evidence need not demonstrate that a particular term always carries a particular meaning or that the particular meaning claimed cannot be otherwise stated. While evidence of nearly universal use of a trade usage term might well be required in order to alter what would otherwise be an unambiguous contract term or phrase, where, as here, a literal reading of the contract produces a nonsensical or unclear meaning and the Court finds that the trade usage term is in frequent use by people in the trade at the relevant time, we conclude that the trade use evidence of the kind here presented can properly be considered.

It follows that Asten is not entitled to judgment as a matter of law on its declaratory judgment claims regarding the Asbestosis Exclusion Clause.

## III. Jury Trial

First, we conclude that the District Court was entitled to find that Asten was unable to prove recoverable damages at trial and to rely upon that fact in resolving the Seventh Amendment issue before it. Contrary to Asten's suggestion, this was not a situation in which damage evidence was found to be too speculative or uncertain. This was a situation where it was firmly established that Asten was not prepared to prove recoverable damages. While it is true, as Asten stresses before us, that it is not impossible for an insured to experience recoverable loss as a result of having to resort to alternative

16

sources of coverage, an insured is obviously not entitled to recover litigation expenses and indemnity for a particular claim twice from two different insurers. Moreover, far more than a "burn rate" needs to be shown to successfully support the "premature exhaustion" theory which Asten appears to be pressing in its brief before us,[1] and no such evidence was tendered in response to the District Court's call for a tender. In short, no evidence has been tendered to prove that Asten had yet suffered a loss as a result of Columbia's denial of coverage.

When faced with a situation in which a party cannot tender evidence essential to its only legal claim, a federal trial court may strike a jury demand without offending the Seventh Amendment. *Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006) (plaintiff not entitled to a jury where it failed to provide computation and evidence of damages pursuant to Rule 26, and only remaining claims were equitable); *AstraZeneca LP v. Tap Pharm. Prods., Inc.*, 444 F. Supp. 2d 278 (D. Del. 2006) (motion to strike jury granted after Court barred damage expert testimony and party did not otherwise have damage case).[2]

---

[1] *See, e.g., Flintkote Co. v. Gen. Accident Assurance Co. of Canada*, No. 04-01827, 2008 WL 3270922 (N.D. Cal. Aug. 6, 2008) (recoverable loss proven under the "premature exhaustion" theory, holding *inter alia* that the calculations under that theory must take into account that the alternate source may have a contribution claim against the insurer).

[2] The parties have not briefed, and we express no opinion with respect to, what, if any, effect this ruling has on Asten's

17

We now turn to the issue of whether the declaratory judgment claims that went to trial were ones that entitled Asten to a jury trial.[3] The controlling law is set forth in our opinion in

---

ability to recover damages on its Count II claims based on Columbia's rejection of the asbestos-related claims tendered to it in the Fall of 2001.

[3]Asten's briefing before us expressly and unambiguously argues that the District Court erred by denying it a jury trial on both its declaratory judgment claims and its breach of contract claim. Its opening brief, for example, devotes separate sections to the declaratory judgment jury trial issue and the breach of contract jury trial issue. At oral argument, however, counsel for Asten answered a question of the Court in a manner that could reasonably be understood to deny that Asten was claiming error with respect to the denial of a jury trial on the declaratory judgment claims. Given this response and the centrality of this issue in the briefing, the Court asked for supplemental, post-argument memoranda directed to whether counsel for Asten intended to waive this claim of error and, if not, whether the Court should resolve this aspect of the appeal based on the briefing. The responses made clear that no waiver was intended, but that Columbia and American insist that a waiver nevertheless resulted. In the absence of prejudice to the opposing party, we prefer resolution on the merits of an issue to disposition of it based on an unintended waiver by counsel. Given that Columbia's and American's position on the issue is fully developed in the briefing, we perceive no prejudice to them from our addressing it on the basis of that briefing, and we elect

*Owens-Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185 (3d Cir. 1979):

> In this diversity action, the plaintiff asked for a declaratory judgment establishing its right under an option agreement to compel the defendant's conveyance of certain realty [at a future date]. Asserting that its answer presented legal issues, the defendant demanded a jury trial, but the district court determined that the suit was the counterpart of an equitable action for specific performance and struck the request for a jury.
>
> * * *
>
> Declaratory judgments were created as a remedy in the federal courts some four years before the merger of law and equity took effect. *See* 28 U.S.C. §§ 2201-2202. The remedy may be granted upon either legal or equitable claims and is *sui generis*. . . .
>
> To effectuate the statute's neutral position on the jury trial, postmerger courts have found it necessary to preserve the distinction between law and equity in the declaratory judgment context. A workable formula that has been developed is to

---

that course. *See, e.g., Baker v. Corcoran*, 220 F.3d 276, 295, n.16 (4th Cir. 2000).

19

<u>determine in what kind of suit the claim would have come to court if there were no declaratory judgment remedy.</u> *See* 9 C. Wright & A. Miller, *supra* § 2313. If the declaratory judgment action does not fit into one of the existing equitable patterns but is essentially an inverted law suit – an action brought by one who would have been a defendant at common law – then the parties have a right to a jury. But if the action is the counterpart of a suit in equity, there is no such right. *See* F. James, Jr. and G. Hazard, Jr., Civil Procedure § 8.10, at 383-84 (2d ed. 1977).

Applying this test the district court properly characterized the case at bar as equitable. The complaint centered on the defendant's obligation to convey title to the plaintiff at a certain time in the future – there was no claim for damages or any other legal remedy. An action for specific performance without a claim for damages is purely equitable and historically has always been tried to the court. *See Klein v. Shell Oil Co.*, 386 F.2d 659 (8th Cir. 1967); 5 Moore's Federal Practice, ¶ 38.21 (2d ed. 1979); 9 C. Wright & A. Miller, *supra* § 2309. The plaintiff's suit, therefore, is not an inverted law suit, but rather is a claim cast in declaratory judgment form because the right to specific performance had not ripened at the time the action was filed.[3]

\* \* \*

*Id*. at 1186 (footnote 2 omitted); 1189-90 (emphasis supplied).

The teachings of *Owens-Illinois* reflect the law generally. *See, e.g., Fischer Imaging Corp. v. Gen. Elec. Co.*, 187 F.3d 1165, 1171 (10th Cir. 1999) (finding a Seventh Amendment right to a jury trial in a declaratory judgment action, in which the plaintiff had not yet suffered injury, because, "absent declaratory judgment procedures," the plaintiff's claim would have "come to the court" in a suit on the contract); *Am. Safety Equip. Corp. v. J.P. Maguire & Co.*, 391 F.2d 821, 824 (2d Cir. 1968) (to assess Seventh Amendment claim "courts have looked to the basic nature of the suit in which the issues involved would have arisen if Congress had not created the Declaratory Judgment Act").

*Owens-Illinois*, like this case, was not an inverted lawsuit situation, and our Court therefore looked to the nature of the claim set forth in the complaint. It concluded that a jury trial was not required because the issues raised in the complaint which allege the right to compel a transfer of real estate to

21

plaintiff at a later date would come to court in a suit for specific performance if there were no declaratory judgment remedy.

If we ask "in what kind of suit [Asten's] claim[s] would have come to court if there were no declaratory judgment remedy," *Owens-Illinois*, 610 F.2d at 1189, it seems clear that the answer is an action in assumpsit for damages consisting, *inter alia*, of reimbursement of litigation costs and amounts paid to victims. *See, e.g.,* 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2313 (2d ed. 1995). There is no possibility that it would arise in a suit for specific performance because an action in assumpsit is an available and adequate remedy at law, *see, e.g., Vanderveen v. Erie Indem. Co.*, 417 Pa. 607, 208 A.2d 837 (Pa. 1965), and "in the federal courts equity has always only acted when legal remedies were inadequate." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959).

Columbia and American insist that Asten's Count I is in the nature of a claim for specific performance or a bill *quia timet*, *i.e.*, "[a] legal doctrine that allows a person to seek equitable relief from a future probable harm to a specific right or interest." *Pennsylvania Nat. Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 950, n.4 (8th Cir. 2004) (quoting Black's Law Dictionary 1260 (7th ed. 1999)). As we have indicated, Asten's claims could not be adjudicated in an action for specific performance because it would have an adequate remedy at law. With respect to bills of *quia timet*, American cites a string of cases which state that a declaratory judgment is "analogous to" or had "its genesis in" the equitable bill of *quia timet*. None involved a situation analogous to this case, and any

22

suggestion that *quia timet* and declaratory judgments are synonymous would prove too much – it would result in all declaratory judgment actions being equitable, and we know that not to be the case.

It is true that a bill of *quia timet* allows "a person to seek equitable relief from a future probable harm," *id*., that he or she fears. As one would expect, however, it does not under all circumstances allow relief from feared harm that has not yet occurred. Essential to *quia timet* equity jurisdiction is the absence of an adequate remedy at law. As the Supreme Court explained in *Di Giovanni v. Camden Fire Ins. Ass'n*., 296 U.S. 64, 68 (1935):

> This Court has recently pointed out that equity will not compel the cancellation and surrender of an insurance policy procured by fraud where the loss has occurred and a suit at law to recover the amount of the loss is pending or threatened. *Enelow v. New York Life Insurance Co.*, 293 U.S. 379. The alleged fraud of petitioners, as well as their alleged destruction of the property insured are defenses available in suits at law upon the policies. While equity may afford relief *quia timet* by way of cancellation of a document if there is a danger that the defense to an action at law upon it may be lost or prejudiced, no such danger is apparent where, as respondent's bill affirmatively shows, the loss has occurred and suits at law on the policies are imminent, and there is no showing that the defenses cannot be set

up and litigated as readily in a suit at law as in equity. See *Enelow v. New York Life Insurance Co., supra*, 384, 385.

*See also In re Lockwood*, 50 F.3d 966 (Fed. Cir. 1995), *vacated*, 515 U.S. 1182 (1995) ("Bills *quia timet* were generally appropriate if there was a danger that a defense at law might be prejudiced or lost if not tried immediately."); 30A C.J.S. <u>Equity</u> § 34 (2008). (The "objective [of bills *quia timet*] is to prevent anticipated mischiefs which could not after their occurrence be adequately redressed.)[4]

---

[4]Appellees' *quia timet* argument relies primarily on *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937). There, an insured claimed he was disabled and thereby contractually relieved of his obligation to pay premiums under several life and disability insurance policies. The insurer disputed and asserted that the policies had lapsed for non-payment of premiums. It filed a declaratory judgment action to secure a declaration that the insured was not disabled. The only issue in the case was whether there was a "case or controversy." In the course of concluding that there was, however, the Court noted that the insured "on repudiation by the insurer of liability in such a case and insistence by the insured that the repudiation was unjustified because of his disability, the insured would have 'such an interest in the preservation of the contracts that he might maintain a suit in equity to declare them still in being.'" *Id.* at 243-44 (quoting *Burnet v. Wells*, 289 U.S. 670, 680 (1933).

In *Haworth*, the insurer had repudiated the policy, and a present adjudication that it was still in effect was necessary to

24

Based on these authorities, the issue posed to us is whether a declaratory judgment claim based on a contract, which would otherwise clearly be a legal claim entitling the plaintiff to a jury, becomes an equitable claim when filed in anticipation of harm but before harm has been suffered. Our answer is "no" unless special circumstances exist which indicate that a suit on the contract is likely to be inadequate when it is available. Since no such circumstances have been shown to exist, we conclude that Asten is entitled to a jury trial on its declaratory judgment claims.[5]

## IV. Laches

The District Court held that "Asten's coverage suit

---

prevent irreparable injury during the policy term. Here, we have a coverage dispute, and Asten has it within its power to put itself in a position to pursue a legal remedy against Columbia and/or American which equity would regard as clearly adequate.

[5]Columbia and American understandably do not argue that they were entitled to a directed verdict and, accordingly, that the striking of the jury demand was harmless error. In the three weeks of trial, the Court heard conflicting testimony about many material facts and resolved to credit one fact witness over another, as well as one expert over another. After doing so, it drew a host of inferences concerning the motivation of the parties at various stages. In short, it exercised the functions that Asten was entitled to have a jury exercise.

25

against Columbia [was] barred under the doctrine of laches," AI0109, but that Asten's coverage suit against American was not. Citing our decision in *Central Penn. Teamsters Pension Fund v. McCormick Dray Line Inc.*, 85 F.3d 1098 (3d Cir. 1996), the District Court began its analysis by recognizing that the "doctrine of laches consists of two essential elements: (1) inexcusable delay in instituting suit; and (2) prejudice resulting to the defendant from such delay." *Id.* at 1108. *See also Class of Two Hundred Admin. Faculty Members v. Scanlon*, 502 Pa. 275, 279, 466 A.2d 103, 105 (1983) (a laches defense poses the issue of "whether, under the circumstances of the particular case, the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice") (quoting *Wilson v. King of Prussia Ent., Inc.*, 422 Pa. 128, 133, 221 A.2d 123, 126 (1966)).[6]

In support of the first prong of its holding, the District Court cited (1) Asten's failure to join Columbia in a coverage action it brought against other insurers in 1980; (2) its failure to notify Columbia of "its hundreds of asbestos-related claims" when they were asserted against Asten; and (3) its two-year delay in notifying Columbia of the underlying claims after it "acknowledged [in 1999] its belief that the defendants may dispute the construction of the Asbestosis Exclusion." AI0110-11.

Asten's primary response to the District Court's laches

---

[6]Asten does not contest the District Court's application of the doctrine of laches to its "coverage suit against Columbia."

holding is based on the Supreme Court of Pennsylvania's decision in *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29, 626 A.2d 502 (Pa. 1993), a case involving an insured with multiple insurance policies covering asbestos-related injuries. The Court there endorsed the so-called "multiple trigger theory of liability" and held as follows:

> In keeping with this analysis, we conclude that each insurer which was on the risk during the development of an asbestosis-related disease is a primary insurer. In order to accord J.H. France the coverage promised by the insurance policies, J.H. France should be free to select the policy or policies under which it is to be indemnified.

> \* \* \*

> When the policy limits of a given insurer are exhausted, J.H. France is entitled to seek indemnification from any of the remaining insurers which was on the risk during the development of the disease. Any policy in effect during the period from exposure through manifestation must indemnify the insured until its coverage is exhausted. We believe this resolution of the allocation of liability issue to be most consistent with the multiple-trigger theory of liability.

> This conclusion does not alter the rules of contribution or the provisions of "other

27

insurance" clauses in the applicable policies.

*Id.* at 508, 509.

Based on *J.H. France*, Asten insists that, under the controlling law of Pennsylvania, it was entitled to select the order in which it brought suit against its insurers and that it had no duty to file suit against Columbia until the limits of its other policies had been exhausted. It stresses that the claims it tendered to Columbia in the Fall of 2001 and sued upon here on March 3, 2003, were filed against it in 2001 and that earlier claims had been covered by other carriers. Asten concludes that, when an insured exercises its right to delay triggering coverage under some policies until it exhausts others, that delay, as a matter of law, cannot be found unreasonable. We agree.

Columbia's primary response to *J.H. France* is that it "is a <u>tender</u> case, not a <u>notice</u> case." Appellant's Br. at 62 (emphasis in original).[7] This is undeniably true. Columbia fails to explain, however, how a party which has not unreasonably delayed in tendering a claim and filing suit can be barred from going forward by laches based on a failure to give earlier notice of its claim. Columbia has cited no authority for this

---

[7]Columbia also argues that *J.H. France* was not decided until 1999, and Asten had already unreasonably delayed in filing suit prior to that decision. *J.H. France* does not purport to be announcing new law, however, and we read it as explaining the common law of Pennsylvania which we must accept as controlling at all times here relevant.

28

proposition, and we have found none. As we have earlier noted, laches speaks to "inexcusable delay in instituting suit" and one who is entitled to delay bringing suit under the applicable law cannot be found to be barred by that doctrine.

The District Court apparently took the same view of *J.H. France*, as Columbia does, also without further explanation. It rejected American's laches defense, while sustaining Columbia's, based on the fact that American, unlike Columbia, had gotten notice of the claims starting in 1979.[8]

We do not, of course, suggest that the history of notice giving in these matters is irrelevant. As we have earlier noted, the policies contain various provisions requiring that notice of claims be given by the insured and breaches of the duties imposed there may, indeed, bar Asten's coverage suit against Columbia, as well as American. But the District Court expressly declined to rule on Columbia's "late notice affirmative defense," finding it "moot" and noting that resolution of it would require it "to unnecessarily examine an uncertain area of Pennsylvania law." AI0144. Without the benefit of the District Court's views regarding the application of the various notice provisions to the record of this case, we, too, decline to address this issue.

## V. Reformation

With respect to the defendants' counterclaims for

_____

[8]American, like Columbia, was not joined in Asten's 1980 coverage litigation.

reformation of their policies, the District Court held as follows:

> Based on the same evidence used to interpret the Asbestosis Exclusion (course of performance and the circumstances surrounding the placement of the Subject Policies), and given that an "exposure to . . . asbestosis" is literally impossible, an alternative ground for this court to reach the same conclusion regarding the scope of the exclusion is through the doctrine of reformation. If the Asbestosis Exclusion is interpreted to bar only asbestosis claims then that construction fails to set forth the true agreement of the parties. The parties believed that the Asbestosis Exclusion excluded all asbestos-related claims and reformation allows me to reform the exclusion to reflect that intent.

AI0149.

As is apparent from this holding, the reformation counterclaim and Asten's declaratory judgment claims regarding the asbestosis exclusion involve common issues. When litigation involves both legal and equitable claims, even if it is the plaintiff that joins such claims, the right to a jury trial on the legal claim, including all issues common to both claims, must be preserved by trying the legal claim to a jury first, or at least simultaneously with the equitable claim, and by accepting the jury's findings on common facts for all purposes. *Lytle v. Household Mfg. Inc.*, 494 U.S. 545 (1990); *Tull v. United States*, 481 U.S. 412 (1987). It follows, *a fortiori*, that Asten's right to

30

a jury trial on its declaratory judgment claims cannot be eliminated by the filing of an equitable counterclaim, like one for reformation. Accordingly, we will vacate the District Court's judgment on the defendants' counterclaim for reformation and remand for further proceedings on that counterclaim.

## VI. Duty to Defend and Pay Defense Costs Under the American Excess Policy

In response to Asten's request for a declaratory judgment regarding American's duty to defend or pay defense costs under its 1982 excess policy, the District Court pointed to the following provisions of that policy:

> The Company shall not . . . be called upon to assume charge of the settlement or defense of any claims made or suits brought, or proceedings instituted against the Insured, but shall have the right and opportunity to be associated with the Insured in the defense and trial of any such claims, suits or proceedings relative to any occurrence which, in the opinion of the Company may create liability on the part of the Company under the terms of the policy. If the Company avails itself of such right and opportunity, the Insured and the Company shall cooperate in all respects so as to effect a final determination of the claim or claims.

* * *

31

Loss expenses and legal expenses, including court costs and interest, if any, which may be incurred by the Insured with the consent of the Company in the adjustment or defense of claims, suits or proceedings shall be borne by the Company and the Insured in the proportion that each party's share of loss bears to the total amount of said loss. Loss expense hereunder shall not include salaries and expense of the Insured's employees incurred in investigation, adjustment and litigation.

AVI0002.

Based on these provisions, the District Court concluded as follows:

According to the unambiguous terms of [the] 1982 American Express [*sic*] Policy, American is not obligated to provide or fund a defense for Asten. American is only required to reimburse Asten for any defense expenses it incurs with American's *consent*.

AI0156 (emphasis in original).

Asten does not maintain that the above quoted language is ambiguous. Rather, it insists (1) that a "follow form clause" of the policy incorporates a duty to defend clause from an underlying policy, and (2) that implied by law in every "consent to defend" clause of this kind is a prohibition against unreasonable refusals to defend. Accordingly, Asten agrees

32

with the District Court that this issue is to be resolved as a matter of law from the face of the documents. Thus, while Asten would have a right to have a jury determine this issue if there were material issues of fact to be resolved, the absence of a jury presents no problem in this context.[9]

Asten insists that the 1982 American Excess Policy follows form to the 1982 American Umbrella Policy, and that it accordingly creates a duty to defend identical to that contained in the Umbrella Policy. The follow-form clause states in relevant part:

---

[9]We reach a different conclusion with respect to Asten's declaratory judgment claim regarding the aggregate liability limit under American's 1982 Umbrella and Excess Liability Policies. The District Court heard extrinsic evidence regarding this issue which is conflicting in part and portions of which are relied upon by each side. The District Court, for example, noted that Gloria Forbes, acting in her capacity as a procuring agent for Asten, requested that the policies "each be written for an 18-month term, each for one premium, and each providing one aggregate limit of $10,000,000." AI103. Accordingly, it is not clear at this point that this issue should be resolved without the assistance of a jury. In the interest of judicial efficiency, we will say only that the testimony of Jerry Leddy, American's Rule 30(b)(6) witness, does not resolve the matter in Asten's favor. Leddy's testimony in regard to the aggregate limit contained no factual admissions, nor did it discuss the intention of the parties when forming the contract. Rather, he offered only his own interpretation of the contract based on his reading of it at trial. This type of legal conclusion is not binding on American, and American was entitled to produce contrary evidence at trial. *See R & B Appliance Parts, Inc., v. Amana Co.*, 258 F.3d 783, 787 (8th Cir. 2001) (distinguishing between matters of fact and conclusions of law in regard to Rule 30(b)(6) depositions).

> The insurance afforded by this policy is subject to the same warranties, terms (including the terms used to describe the application of the limits of liability), conditions and exclusions as are contained in the underlying insurance . . . except, unless otherwise specifically provided in this policy, any such warranties, terms, conditions or exclusions relating to premium, *the obligation to investigate and defend*, the amount and limits of liability, and any renewal agreement.

AVI0002 (emphasis added).

Interpreting the above language, the District Court determined that any "'obligation to investigate or defend' which may be contained in the underlying 1982 American Umbrella Policy, to which the 1982 American Excess Policy follows form, [is] not incorporated into the 1982 American Excess Policy." AI107. The District Court's determination was based on a plain reading of the contractual language, which clearly carves out any obligation to defend. We find no error in the District Court's analysis and, accordingly, affirm its holding that no obligation to defend arises from the follow-form clause.

We are likewise unconvinced by Asten's argument that every "consent to defend" clause contains by implication a prohibition against the unreasonable refusals to defend. The District Court noted that the American Excess Policy requires American to indemnify Asten for its "ultimate net loss" in excess of its underlying insurance, and that the policy defines ultimate net loss to include "all sums actually paid or which the Insured is legally obligated to pay as damages in settlement of satisfaction of claims or suits for which insurance is afforded by this policy. . . ." AI0105. Notably, defense costs are not included within this language.

34

In determining that American had no obligation to defend, the District Court stated the unremarkable proposition that "the duty to defend is contractual and if there is no contract to defend than [*sic*] there is no duty to defend." AI156 (citing 7C Appleman, Insurance Law and Practice § 4682 (1979 & Supp. 1995); *City of Burlington v. Arthur J. Gallagher & Co.,* 944 F.Supp. 333, 335-36 (D. Vt. 1996)). We agree with the District Court's determination that American has no obligation to defend Asten in the absence of contractual language creating such an obligation. *See also Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.,* 73 F.3d 1178, 1219 (2d Cir. 1995) ("[T]he insurer has no duty to defend or pay costs, but only has the right to do so at its own election. The insurer can permit the insured's defense to proceed and take the chance that the insured might exceed the limits of other liability coverage, or participate in the defense and agree to pay all or part of the defense costs incurred."); *City of Burlington*, 944 F.Supp. at 337 ("Courts across the country have construed policy language requiring the consent of the insurer as creating an option, but not a duty, to defend."); *Crown Ctr. Redev. Corp. v. Occidental Fire & Casualty Co.*, 716 S.W. 2d 348, 357 (Mo. Ct. App. 1986) (interpreting the same language at issue here and holding "the obligation of American to pay defense costs is neither fixed nor absolute . . . the entire obligation is conditioned on the consent of American and not simply the procedure by which the obligation is carried out.").

In asserting that the consent to defend clause contains an implied prohibition against unreasonable refusals, Asten cites to consent to settlement cases. Courts have generally required insurers to consent to reasonable settlements because of the potential for a conflict of interest between the insured party and the insurer, which could result in insurers wrongfully denying insured parties access to coverage they have paid for and are entitled to receive. *See* 14 Lee R. Russ & Thomas F. Segalla,

Couch on Insurance § 203.13 (3d ed. 2005) ("While the insured may prefer to settle within policy limits and avoid the risk of trial, the insurer may have an incentive to reject offers at or close to policy limits and proceed to trial with the hope of a lower judgement or a verdict in its favor."); *Nationwide Mut. Ins. Co. v. Lehman*, 743 A.2d 933, 941 (Pa. Super. Ct. 1999) (an insured party is legitimately entitled to claim benefits from the insurer unless the insurer comes forward and proves that the settlement prejudiced its interests). We find no similar conflict of interest in the context of defending insurance claims, and we decline to read into the contractual language a prohibition against unreasonable refusals where none exists.

## VIII. Conclusion

We will affirm the judgment of the District Court insofar as it declared the obligations of American with respect to the duty to defend or pay defense costs under the 1982 American Excess Policy. Asten was entitled to a jury trial on its other declaratory judgment claims, however, and in all other respects the judgment of the District Court will be reversed, and this case will be remanded for further proceedings consistent with this opinion.