PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2206
_____

SAPA EXTRUSIONS, INC.
f/k/a ALCOA Extrusions, Inc.,
Appellant

v.

LIBERTY MUTUAL INSURANCE COMPANY;
NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH, PA;
GERLING KONZERN ALLEGEMEINE
VERSICHERUNGS-AG
a/k/a Gerling Konzern General Insurance Company;
PACIFIC EMPLOYERS
INSURANCE COMPANY; ACE AMERICAN
INSURANCE COMPANY;
ARCH SPECIALTY INSURANCE COMPANY f/k/a Rock
River Insurance Company;
GREAT AMERICAN ASSURANCE COMPANY;
INSURANCE COMPANY OF THE
STATE OF PENNSYLVANIA
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
No. 3:13-cv-02827
District Judge: Hon. Malachy E. Mannion
_____

Argued: May 1, 2019

Before: RESTREPO, PORTER, and FISHER, *Circuit Judges*.

(Filed: September 13, 2019)
_____

James C. Martin     [**Argued**]
REED SMITH LLP
Reed Smith Center
225 Fifth Avenue
Pittsburgh, PA 15222

Luke E. Debevec
Jenna Farr
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103

Michael Conley
Meghan K. Finnerty
OFFIT KURMAN
1801 Market Street, Suite 2300
Philadelphia, PA 19103

     *Counsel for Appellant Sapa*
*Extrusions, Inc.*


Teresa Ficken Sachs    [**Argued**]
William C. Foster
Audrey J. Copeland
MARSHALL DENNEHEY WARNER
COLEMAN & GOGGINS
2000 Market Street, Suite 2300
Philadelphia, PA 19103

     *Counsel for Appellee Liberty*
*Mutual Insurance Company*


Phillip R. Earnest
Adam J. Tragone
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI LLP
301 Grant Street
Pittsburgh, PA 15219

2

Agelo L. Reppas
Allyson C. Spacht
BATESCAREY LLP
191 North Wacker Drive, Suite 2400
Chicago, IL 60606

  *Counsel for Appellees National Union Fire Insurance Company of Pittsburgh, PA, and Insurance Company of the State of Pennsylvania*


Shane R. Heskin
WHITE AND WILLIAMS LLP
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103

  *Counsel for Appellee Gerling Konzern Allegemeine Versicherungs AG, a/k/a Gerling Konzern General Insurance Company*


Stephen A. Cozen  [**Argued**]
Deborah M. Minkoff
Stephen S. Kempa
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103

  *Counsel for Appellees Pacific Employers Insurance Company and Ace American Insurance Company*


Jonathan P. McHenry
Thomas M. Wester
CONNELL FOLEY LLP
56 Livingston Avenue
Roseland, NJ 07068

*Counsel for Appellee Arch*
*Specialty Insurance Company*


Michael A. Kotula
Michael E. Buckley
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, NY 11556

*Counsel for Appellee Great*
*American Assurance Company*


John G. Koch
WEISBROD MATTEIS & COPLEY PLLC
Two Logan Square, Suite 1925
100 N. 18th Street
Philadelphia, PA 19103

*Counsel for Amicus Curiae*
*United Policyholders*


Maureen M. McBride
James C. Sargent
LAMB MCERLANE PC
24 East Market Street, Box 565
West Chester, PA 19381

*Counsel for Amici Curiae*
*American Property Casualty Insurance*
*Association and Insurance Federation*
*of Pennsylvania*


Louis C. Long
THOMAS, THOMAS & HAFER
525 William Penn Place, Suite 3750
Pittsburgh, PA 15219

*Counsel for Amicus Curiae*
*Pennsylvania Defense Institute*

4

Robert J. Cosgrove
WADE CLARK MULCAHY
1515 Market Street, Suite 2050
Philadelphia, PA 19102

> *Counsel for Amicus Curiae*
> *Philadelphia Association of Defense*
> *Counsel*

———————

## OPINION OF THE COURT
———————

PORTER, *Circuit Judge*.

This appeal asks whether, under Pennsylvania insurance law, a manufacturer may recover from its liability insurers the cost of settling a lawsuit alleging that the manufacturer's product was defective. Consistent with longstanding precedent, we hold that recovery turns on the language of the specific insurance policies at issue. We will thus affirm in part and vacate in part the District Court's judgment and remand for further consideration consistent with this opinion.

### I

### A

Sapa Extrusions, Inc.[1] manufactures aluminum extruded profiles, which are formed by pushing a hot billet of aluminum alloy through a metal die with a hydraulic press. After forming, but before delivering, the extrusions, Sapa pre-

---

[1] As reflected in the various insurance policies at issue, Sapa has changed its corporate identity a few times over the relevant years. For simplicity's sake, we refer to Sapa and its predecessors in interest—Alcoa Extrusions, Inc. and Alumax, Inc.—and Sapa's successor—Hydro Extrusions—as "Sapa."

treats the metal and coats it with primer and topcoat. As Sapa describes it, "[t]his pretreatment coating process is done in multiple stages, involving cleaning and degreasing to remove organic and inorganic materials, chemical etching, and finally chemical coating to assist with paint adherence." Appellant's Br. 11.

For decades, Sapa supplied "organically coated extruded aluminum profiles" to Marvin Lumber and Cedar Company and Marvin Windows of Tennessee, Inc. (together, "Marvin"). App. 155–56. Marvin incorporated these extrusions with other materials to "manufactur[e] aluminum clad windows and doors and related products." App. 156. This process was permanent, so if an extrusion was defective for some reason, it was not feasible to swap out only that extrusion. Instead, the whole window or door would have to be replaced. Between 2000 and 2010, Sapa sold about 28 million extrusions to Marvin, which Marvin incorporated in about 8.5 million windows and doors.

Sapa agreed to Marvin's "Aluminum Extrusion Coating Specification" in 1996. App. 157. This contract provided that "the coating used on aluminum extrusions used on Marvin window and door products shall meet or exceed all of the requirements" of a relevant industry standard. *Id.* Sapa later agreed to revisions of Marvin's specification that incorporated the updated industry standard.

Over the course of its relationship with Sapa, Marvin sometimes received complaints from customers that the aluminum parts of its windows and doors would oxidize or corrode. At first, Sapa and Marvin worked together to determine the nature of these complaints and how to fix them. In the mid-2000s, however, there was an uptick in these complaints, most of which came from people who lived within a mile or so from the ocean.

In 2010, Marvin sued Sapa in the United States District Court for the District of Minnesota (the "Underlying Action"), alleging that Sapa had sold it extrusions that failed to meet Marvin's specifications. Marvin asserted claims for (1) breach of contract, (2) breach of express warranty, (3) breach of implied warranty of merchantability, (4) breach of implied warranty of fitness for a particular purpose, (5) fraud, (6)

6

negligent misrepresentation, (7) unlawful trade practices, (8) consumer fraud, (9) fraudulent concealment, and (10) contribution/indemnity.

Here are the relevant allegations in the Marvin Complaint.

- Sapa made specific warranties to Marvin about its extrusions, including that they would "meet the applicable [industry] specifications for superior performing organic coatings on aluminum extrusions." App. 157.

- Sapa "changed its processes, procedures, and materials for the pretreatment of organically coated extruded aluminum profiles without notifying Marvin of this significant and material change." App. 158.

- Sapa assured Marvin that the changes to the pre-treatment process would not affect the quality of the extrusions, even though Sapa knew (and intentionally concealed from Marvin) that the extrusions did not meet Marvin's specifications. Sapa "represented to Marvin that it would fully stand behind its organically coated extruded aluminum profiles if they failed to perform or were otherwise defective." App. 161.

- Marvin's products that incorporated Sapa's extrusions "prematurely failed in coastal installations in the field at an abnormal rate." App. 161. In particular, surface finishes were "peeling, losing adhesion, or otherwise degrading in a manner which far exceed[ed] the minimal corrosion occasionally experienced on aluminum clad windows and doors installed near the coast." *Id.*

- Marvin "expended in excess of $75,000 in repairing and/or replacing Sapa's organically coated extruded aluminum profiles [that] experienced surface cracking, checking, peeling and/or loss of adhesion in installations in the field." App. 162.

7

Marvin sought monetary damages for "economic losses stemming from 'investigating and responding to' consumer complaints, 'identifying and qualifying alternative' extrusion suppliers, 'repairing' and 'replacing' the failed extrusions, rebuilding its 'valuable reputation,' and experiencing lost 'sales and profits.'" App. 10.

Marvin and Sapa engaged in nearly three years of discovery. They then cross-moved for summary judgment. Among other things, the Minnesota district court held that:

- Genuine disputes of material facts precluded summary judgment on whether (1) Sapa provided Marvin with an express performance warranty, (2) Sapa's terms and conditions applied to the parties' extrusion deals, and (3) Sapa breached its contract with Marvin for the extrusions that Marvin had not yet incorporated into its products. *Marvin Lumber & Cedar Co. v. Sapa Extrusions, Inc.*, 964 F. Supp. 2d 993, 998–1003 (D. Minn. 2013).

- Marvin's choice to provide Sapa with detailed specifications for the extrusions precluded Marvin's claim for breach of implied warranties. *Id.* at 1005–06. ("Marvin may pursue a breach of warranty for Sapa's alleged failure to meet its specifications, but its decision to provide those specifications precludes any implied warranties that might have otherwise arisen between the parties.").

- Marvin's claim for negligent misrepresentation failed because, under Minnesota's "independent duty rule," "Sapa owed Marvin no extra-contractual duty of care." *Id.* at 1006.

- Under Minnesota's economic-loss rule, Marvin could not assert tort claims for any of Sapa's alleged misrepresentations "based on conduct that would constitute a breach of contract." *Id.* at 1008 ("[A]ny tort claim premised on Sapa's failure to conform to [Marvin's] specifications is premised on a breach of contract (or rather, breach of warranty) and barred under Minnesota law.").

8

On the eve of trial in 2013, Sapa and Marvin settled their dispute for a large sum.

B

Throughout the period implicated by Marvin's allegations, Sapa maintained twenty-eight commercial general liability (CGL) insurance policies through eight insurance carriers (together, the "Insurers").[2] Combined, these policies supposedly blanketed the relevant period with liability coverage. Each policy required an "occurrence"—a term specifically defined in each policy—to trigger coverage.

Sapa tendered Marvin's claims to another carrier, Zurich American Insurance Company, which accepted the defense under a reservation of rights. But the Insurers disclaimed coverage. So Sapa sued them all in late 2013, asserting breach of contract under the twenty-eight policies and seeking a declaratory judgment to recover the cost of the underlying settlement. The parties engaged in extensive discovery before each moved for summary judgment.

The District Court first held that, to determine whether coverage existed under any of the policies for Marvin's claims and the resultant settlement, it could rely only on how Marvin had framed its claims in its underlying complaint. The District Court thus did not rely on any evidence uncovered in the three years of discovery in the Underlying Action. On the merits, the District Court analyzed coverage under all twenty-eight policies as a group. Agreeing with the Insurers, the Court held that Marvin's claims in the Underlying Action were not an

---

[2] Sapa had primary CGL policies through Liberty Mutual Insurance Company ("Liberty Mutual"), Pacific Employers Insurance Company ("Pacific"), and Ace American Insurance Company ("Ace"). Sapa also had umbrella and excess policies through National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), Insurance Company of the State of Pennsylvania ("ICSOP"), Gerling-Konzern General Insurance Company ("Gerling"), Arch Specialty Insurance Company ("Arch"), and Great American Assurance Company ("Great American").

"occurrence" that triggered coverage under any of the policies. The District Court also rejected Sapa's ancillary arguments on other coverage-triggering theories. In sum, the District Court held that the Insurers did not have to indemnify Sapa, thereby forcing Sapa to bear the full settlement and defense costs itself. Sapa timely appealed.

## II

The District Court had subject matter jurisdiction under 28 U.S.C. § 1332(a)(1). We have appellate jurisdiction under 28 U.S.C. § 1291. We review the District Court's grant of summary judgment de novo. *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 229 n.1 (3d Cir. 2010). And we apply the same standards and presumptions as the District Court. *Gardner v. State Farm Fire & Cas. Co.*, 544 F.3d 553, 557 (3d Cir. 2008).

## III

The ultimate issue here is whether any of the Insurers must indemnify Sapa under their respective policies for Sapa's settlement with Marvin. That final coverage determination will require us to interpret and apply the plain language of the policies under Pennsylvania law. But first, we must decide what facts we may consider in conducting that analysis.

The parties dispute the proper scope of our review. Sapa says that we should examine any facts that Sapa or Marvin knew when they agreed to settle. The Insurers respond that we may consider only the averments in the Marvin Complaint. We think the Insurers' position is better grounded in Pennsylvania law and we see no reason to depart from that precedent here.

### A

Three points anchor our analysis.

First, a liability insurer's duty to defend an insured and its duty to indemnify are distinct, though related obligations. *See Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 896 n.7 (Pa. 2006). Both are creations of contract. *See Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286,

10

290–91 (Pa. 2007); *Genaeya Corp. v. Harco Nat. Ins. Co.*, 991 A.2d 342, 347 (Pa. Super. Ct. 2010).

Second, in the context of a declaratory judgment action to determine an insurer's obligations, Pennsylvania courts consistently apply what is known as the "four-corners rule." *See Lupu v. Loan City LLC*, 903 F.3d 382, 389–90 (3d Cir. 2018) (collecting cases). That is, when a policyholder is sued, "an insurer's duty to defend is triggered, if at all, by the factual averments contained in [the underlying] complaint[.]" *Kvaerner*, 908 A.2d at 896; *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 541 (Pa. 2010); *Mut. Ben. Ins. Co. v. Haver*, 725 A.2d 743, 745–46 (Pa. 1999) ("A carrier's duties to defend and indemnify an insured in a suit brought by a third party depend upon a determination of whether the third party's complaint triggers coverage."); *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 673 (3d Cir. 2016). And "[i]f the allegations of the underlying complaint *potentially* could support recovery under the policy, there will be coverage at least to the extent that the insurer has a duty to defend its insured in the case." *Ramara*, 814 F.3d at 673; *see Jerry's Sport Ctr.*, 2 A.3d at 541. If triggered, the duty to defend also carries "a conditional obligation to indemnify in the event the insured is held liable for a claim covered by the policy." *Gen. Accident Ins. Co. of Am. v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997). Both duties are at issue until the underlying "claim is confined to a recovery that the policy does not cover." *Id.*

Third, because the duty to defend is "broader" than the duty to indemnify, if a court determines that the former does not exist, neither does the latter. *See Kvaerner*, 908 A.2d at 896 n.7; *Ramara*, 814 F.3d at 673.

B

Sapa argues two points in response that, it says, make the four-corners rule inappropriate here. We find neither persuasive.

First, Sapa points to language from *State Farm Fire & Cas. Co. v. DeCoster*, 67 A.3d 40 (Pa. Super. Ct. 2013), which supposedly shows that the four-corners rule does not apply when determining an insurer's duty to indemnify. There, the court distinguished the duty to defend and the duty to

11

indemnify, explaining that the former is broader and "arises whenever the complaint filed by the injured party may potentially come within the coverage of the policy." *Id.* at 45 (citation omitted). The duty to indemnify, by contrast, "is not necessarily limited to the factual allegations of the underlying complaint. Rather, there must be a determination that the insurer's policy *actually* covers a claimed incident." *Id.* at 46 (internal quotation marks and citation omitted). Sapa takes this to mean that it may rely on facts outside the Marvin Complaint to prove that coverage exists.

But *DeCoster* simply rephrases the principles outlined above. The duty to defend is "broader" than the duty to indemnify, so an insurer must defend an insured against allegations that are even "*potentially* within the scope of the policy"—including those that are "groundless, false, or fraudulent." *Jerry's Sport Ctr.*, 2 A.3d at 541 (internal quotation marks and citations omitted and emphasis added). To offset this initial burden, "[a]n *insurer* may rely on evidence outside of the complaint to ultimately prove it has no duty to indemnify." *DeCoster*, 67 A.3d at 46 (emphasis added). Pennsylvania law thus creates a ratchet of sorts between the two duties. The initial *allegations* in the underlying complaint that may trigger the insurer's duty to defend must eventually mature into provable *facts* to spark a duty to indemnify. *See id.* at 49.

But this ratchet works in only one direction. Sapa points to no case holding that, when an underlying complaint never triggered a duty to defend, an *insured* may rely on facts outside the complaint to show that coverage exists. Indeed, were that the case, "an insurer would be required to monitor the pre-trial developments of a case in which coverage was denied to [e]nsure that no discovery sheds light upon a possible claim for which a defense is mandated." *Scopel v. Donegal Mut. Ins. Co.*, 698 A.2d 602, 606 (Pa. Super. Ct. 1997). Sapa's reliance on *DeCoster* is thus misplaced.[3]

---

[3] We also note that Sapa's argument to avoid the four-corners rule also raises a question it cannot answer: what outside-the-Marvin Complaint "facts" should we credit? The discovery in both the underlying litigation and the coverage

12

Second, Sapa says that applying the four-corners rule would be misguided here because we ought to focus on the parties' knowledge at the time of the settlement. Sapa likens this case to *Babcock & Wilcox Co. v. Am. Nuclear Insurers*, 131 A.3d 445 (Pa. 2015), and *Alfiero v. Berks Mutual Leasing Co.,* 500 A.2d 169 (Pa. Super. 1985). In both cases, the insurers had not fully accepted coverage of the underlying disputes (either by outright, bad-faith rejection or under a reservation of rights), and the insureds, when presented with reasonable

litigation was extensive—as shown by the mountain of appendices that the parties unhelpfully submitted. And that voluminous discovery apparently turned up "facts" supporting both sides. Indeed, the Minnesota District Court denied summary judgment on many of Marvin's central claims primarily because the two-and-a-half years of discovery at that point had produced countervailing narratives and the parties could not agree on what had happened.

In *Pacific Indemnity Company v. Linn*, the court explained that its decision on the insurers' duty to indemnify, which might normally encompass facts outside of the complaint, was muddled by the parties' settlement of the underlying action. *See* 590 F. Supp. 643, 650 (E.D. Pa. 1984). In other words, "because those cases implicating the duty to indemnify were terminated by settlement rather than final judgment, it is now impossible to determine on what theories of liability, if any, the underlying plaintiffs would have prevailed." *Id.* So because there were "no factual findings to consider in determining which insurers [were] obligated to indemnify Dr. Linn," "the duty to indemnify must follow the duty to defend." *Id.* We affirmed. *See Pacific Indem. Co. v. Linn*, 766 F.2d 754, 766 (3d Cir. 1985).

So too here. We have little to no fact-finding from the Underlying Action on which we could base a nuanced coverage determination because the parties settled that case before it went to trial. So Sapa's scope theory would effectively force it and the Insurers to try the Underlying Action before then trying the coverage case, all without the participation of a principal party-in-interest in the Underlying Action—Marvin. As we have explained, Pennsylvania law does not allow for this possibility.

13

settlement options, settled without consent from their insurers. *Babcock*, 131 A.3d at 448; *Alfiero*, 500 A.2d at 171. The *Alfiero* court held that, because the insurer had denied coverage in bad faith and because the underlying settlement was reasonable, the insurer was on the hook for the remaining value of the settlement. *See* 500 A.2d at 172. The *Babcock* court held that an insurer defending under a reservation of rights that refused consent to settle may be liable to the insured for the value of a settlement that is "fair and reasonable from the perspective of a reasonably prudent person in the same position [as they insured] and in light of the totality of the circumstances." 131 A.3d at 463.

But here, none of the Insurers had accepted any obligations under the policies at the time of settlement. And the record nowhere suggests (nor does Sapa argue) that any of the Insurers' denials of coverage were in bad faith. So *Babcock* and *Alfiero* are inapt.

C

We will apply the four-corners rule here, mindful that Pennsylvania courts have consistently declined to expand it. *See Lupu*, 903 F.3d at 391 ("Pennsylvania courts have identified no exception to the [four-corners rule]." (internal quotation marks and citation omitted)). This was reemphasized by the Pennsylvania Supreme Court in *Kvaerner*:

> The Superior Court … [erred by] depart[ing] from the well-established precedent of this Court requiring that an insurer's duty to defend and indemnify be determined solely from the language of the complaint against the insured. We find no reason to expand upon the well-reasoned and long-standing rule that an insurer's duty to defend is triggered, if at all, by the factual averments contained in the complaint itself.

14

*Kvaerner*, 908 A.2d at 896 (citations omitted). And Pennsylvania courts have applied the four-corners rule consistently since. *See, e.g.*, *Kiely ex rel. Feinstein v. Phila. Contributionship Ins. Co.*, 206 A.3d 1140, 1146 (Pa. Super. Ct. 2019) ("The question of whether a claim against an insured is potentially covered is answered by comparing the four corners of the insurance contract to the four corners of the complaint. We do not consider extrinsic evidence." (internal quotation marks and citations omitted)); *Burchick Constr. Co., Inc. v. Harleysville Preferred Ins. Co.*, No. 1051 WDA 2012, 2014 WL 10965436, at *8 (Pa. Super. Ct. Mar. 10, 2014).

In short, Pennsylvania courts have unambiguously adopted and consistently enforced the four-corners rule. And although this bright-line standard may "leave[] would-be insureds in the lurch if a covered claim is not identifiable in the complaint," Pennsylvania courts have allowed for this possibility "in exchange for a clear rule's benefit." *Lupu*, 903 F.3d at 392. Since our mandate here is to apply Pennsylvania law, we will again "honor [the Pennsylvania Supreme Court's] decision to maintain a simple, bright-line rule." *Id.* at 391. So we will confine our review to only the alleged facts in the Marvin Complaint.

IV

Having established the limited scope of our review, we now turn to the merits of the parties' coverage dispute. Our analysis proceeds in three steps. First, we examine "the terms of the polic[ies,] which are … manifestation[s] of the 'intent of the parties.'" *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc.*, 562 F.3d 591, 595 (3d Cir. 2009) (quoting *Baumhammers*, 938 A.2d at 290).[4] Second, we assess relevant precedent interpreting the operative policy terms. Finally, as necessary, we "compare the terms of the polic[ies] to the allegations in the [Marvin Complaint]," *id.* at 595–96 (citing *Kvaerner*, 908 A.3d at 896), determining whether Marvin's factual allegations

---

[4] Under Pennsylvania law, we review the plain language of a policy to determine its meaning. *Baumhammers*, 938 A.2d at 290. If the text is clear, we enforce it as written. *Id.* If the language is ambiguous, we construe it in favor of the insured. *Id.*

15

trigger the policies' provisions of coverage, *see Haver*, 725 A.2d at 745–46.

We also note at the outset that the District Court erred by considering only the headings of the counts in the Marvin Complaint. For example, the District Court facially rejected Sapa's coverage assertion based on Marvin's breach-of-contract and breach-of-warranty claims without reviewing their underlying factual bases. Pennsylvania law is clear that facts matter more than labels: "the particular cause of action that a complainant pleads is not determinative of whether coverage has been triggered[;] [i]nstead it is necessary to look at the factual allegations contained in the complaint." *Haver*, 725 A.2d at 745. So our coverage analysis below considers the facts alleged in the Marvin Complaint, no matter how those facts are arranged to support individual counts.

A

We start with the language of the policies. Sapa asserts coverage under twenty-eight different liability policies issued by the eight Insurers. In general, each policy requires its respective insurer to reimburse Sapa for "sums that [Sapa] becomes legally obligated to pay as damages because of … 'property damage' … *caused by an 'occurrence*[.]'" *E.g.*, App. 4884 (emphasis added).

The policies variously define "occurrence." These definitions fit into three categories, which we have named to help keep them straight.

- **The "Accident Definition."** Nineteen policies—in general, the ACE policies and those that follow form to them—define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *E.g.*, App. 5358.

- **The "Expected/Intended Definition."** Seven policies—the National Union policies and those that follow form to them—define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in **Bodily Injury** or **Property**

16

**Damage** neither expected nor intended from the standpoint of the **Insured**." *E.g.*, App. 930.

- **The "Injurious Exposure Definition."** Two policies—the Liberty Mutual policies—define "occurrence" as "injurious exposure, including continuous or repeated exposure, to conditions, which results, during the policy period, in personal injury or property damage … neither expected or intended from the standpoint of the insured." *E.g.*, App. 4263.

B

We are also mindful that Pennsylvania courts (and federal courts applying Pennsylvania law) have said what "occurrence" means. Three cases most inform our analysis.[5] We will summarize them briefly.

1. ***Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888 (Pa. 2006).**

Bethlehem Steel hired Kvaerner Metals to construct a coke oven battery. *Id.* at 891. Bethlehem later discovered problems with the battery and sued Kvaerner for breach of contract. *Id.* Kvaerner notified its insurer, National Union, seeking defense and indemnity under two occurrence-based CGL insurance policies. *Id.* at 891–92. But National Union disclaimed coverage, so Kvaerner sued for a declaratory judgment. *Id.* at 892. The policies at issue contained the Accident Definition of "occurrence." *Id.* at 897.

---

[5] Since we are interpreting and applying Pennsylvania law, our analysis is controlled by the Pennsylvania Supreme Court's decisions and precedential opinions from this Court. *See Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 216 (3d Cir. 2010) ("When ascertaining Pennsylvania law, the decisions of the Pennsylvania Supreme Court are the authoritative source."); *Smith v. Calgon Carbon Corp.*, 917 F.2d 1338, 1343 (3d Cir. 1990). Decisions from Pennsylvania's intermediate appellate courts may be persuasive. *See State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 108 (3d Cir. 2009).

17

The Pennsylvania Supreme Court reasoned that, under the policies' plain language, an "occurrence … is an accident." *Id.* And because the policies did not define "accident," the court consulted a dictionary: "'[a]n unexpected and undesirable event,' or 'something that occurs unexpectedly or unintentionally.'" *Id.* at 897–98 (quoting Webster's II New College Dictionary 6 (2001)). The court noted that "[t]he key term in the ordinary definition of 'accident' is 'unexpected,'" which "implies a degree of fortuity that is not present in a claim for faulty workmanship." *Id.* So "provisions of a general liability policy provide coverage if the insured work or product *actively malfunctions*, causing injury to an individual or damage to another's property." *Id.* at 898 (quoting *Snyder Heating v. Pa. Mfrs.' Ass'n Ins. Co.*, 715 A.2d 483, 487 (Pa. Super. 1998) (original alterations and internal quotation marks omitted)). But "[c]ontractual claims of poor workmanship d[o] not constitute the active malfunction needed to establish coverage under the policy." *Id.* ("[T]he *fortuity* implied by reference to accident or exposure is not what is commonly meant by a failure of workmanship." (quoting *McAllister v. Peerless Ins. Co.*, 474 A.2d 1033, 1036 (N.H. 1984) (internal quotation marks omitted))).

On top of this fortuity analysis, the Pennsylvania Supreme Court examined whether any harm befell third-party property. *See id.* at 898–99 ("[A] CGL policy may provide coverage where faulty workmanship caused bodily injury or damage to another property, but not in cases where faulty workmanship damages the work product alone." (citing *L–J, Inc. v. Bituminous Fire & Marine Ins. Co.*, 621 S.E. 2d 33, 36 n.4 (S.C. 2005))). The court was concerned that allowing manufacturers to recover for shoddy workmanship "would convert CGL policies into performance bonds, which guarantee the work, rather than like an insurance policy, which is intended to insure against accidents." *Id.* at 899.

Applying these principles, the court held that, because Bethlehem had alleged "only property damage from poor workmanship to the work product itself," Kvaerner's "faulty workmanship [did] not constitute an 'accident' as required to set forth an occurrence under the CGL policies." *Id.* at 900. So "National Union had no duty to defend or indemnify Kvaerner in the action brought by Bethlehem." *Id.*

18

## 2. *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc.*, 562 F.3d 591 (3d Cir. 2009).

CPB was "an importer and wholesaler of chondroitin, a nutritional supplement made from animal cartilage." *Id.* at 593. CPB contracted with Rexall, a nutrition tablet manufacturer, to deliver thousands of pounds of chondroitin, which Rexall would combine with other substances to create marketable tablets for consumers. *Id.* at 594. Rexall sued CPB, alleging that CPB had delivered defective chondroitin. *Id.* And unfortunately for Rexall, it had not discovered the problem until after it had incorporated the chondroitin with other substances to make the tablets, so Rexall was stuck with nearly a million dollars of worthless product. *Id.*

CPB tendered the claim to its insurer, Nationwide, seeking defense and indemnity under an occurrence-based CGL policy. *Id.* The policy contained the Accident Definition of "occurrence." *Id.* Nationwide at first accepted the defense, but later sued for a declaratory judgment to avoid coverage. *Id.* at 595.

On appeal, we noted two mistaken theories of coverage. First, we explained that, under *Kvaerner*'s logic, "Rexall's claim that [CPB] provided defective chondroitin, without more, would not trigger coverage." *Id.* at 596. Rexall's allegations of "faulty workmanship" were "not covered by the policy, although the workmanship involved [was] a failure to perform quality control as to the product to be delivered rather than a failure to build a coke oven to the proper specifications." *Id.* (citing *Kvaerner*, 908 A.2d at 899).

Second, we explained that Rexall's claim for consequential damages did not change our analysis. *Id.* *Kvaerner*'s logic, we noted, is not limited to situations in which only "the work product itself" is damaged. *Id.* On the contrary, "claims for faulty workmanship"—in other words, the failure to provide a product as agreed—are "too foreseeable to be considered an accident," even if a faulty product damages property other than itself. *Id.* Because it was "certainly foreseeable that the product CPB sold would be used for the purpose for which it was sold," we held that the "degree of

19

fortuity" was no different from that involved in *Kvaerner*. *Id.* at 597 (quoting *Kvaerner*, 908 A.2d at 898).[6]

So Rexall's claims were not an "occurrence," and there was no coverage.

### 3. *Specialty Surfaces Int'l, Inc. v. Continental Cas. Co.*, 609 F.3d 223 (3d Cir. 2010).

Sprinturf, a manufacturer of synthetic turf, was hired as a subcontractor to construct football fields for Shasta Union High School District. *Id.* at 227. A different contractor prepared the base for each field and Sprinturf installed the turf and a third-party drainage system. *Id.* Shasta sued Sprinturf for breach of warranty, alleging that the drainage systems in the fields had been defectively constructed and installed. *Id.* at 227–28. Because of the resultant water damage, Shasta asserted, the fields were unstable and the subgrade was ruined. *Id.* at 228. Shasta later amended the complaint to add breach-of-contract and negligence claims. *Id.*

Sprinturf tendered the claim to its insurer, Continental, requesting coverage under an occurrence-based CGL policy that contained the Accident Definition of "occurrence." *Id.* at 227–28. Continental first disclaimed coverage, but then agreed to defend Sprinturf when Shasta added the negligence claim in the amended complaint. *Id.* 228–29. Sprinturf eventually sued for a declaratory judgment that Continental had to defend and indemnify on all claims. *Id.* at 229.

On appeal, we relied on *Kvaerner* and *CPB* in concluding that, under Pennsylvania law, "[i]n order for a claim to trigger coverage, there must be a causal nexus between

---

[6] We also noted that the Pennsylvania Superior Court had slightly extended *Kvaerner*'s logic in *Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706 (Pa. Super. Ct. 2008). There, the court reasoned that "natural and foreseeable acts ... which tend to exacerbate the damage, effect, or consequences caused *ab initio* by faulty workmanship also cannot be considered sufficiently fortuitous to constitute an 'occurrence' or 'accident' for the purposes of an occurrence based CGL policy." *CPB*, 562 F.3d at 597 (quoting *Gambone*, 941 A.2d at 713).

the property damage and an 'occurrence,' i.e., a fortuitous event." *Id.* at 231. We also declared that "[f]aulty workmanship, *even when cast as a negligence claim*, does not constitute such an event; nor do natural and foreseeable events like rainfall." *Id.* (emphasis added).

Applying these principles, we held that Continental was not bound to defend or indemnify Sprinturf for Shasta's original complaint because Shasta had asserted only a breach-of-contract claim. *Id.* at 238. As for Shasta's amended complaint, we held that adding the negligence claim made no difference. *Id.* at 238–39. In short, we reasoned that the alleged damage to the subgrade (not installed by Sprinturf) did not amount to an "occurrence" because it was "foreseeable." *Id.* at 239 (citing *Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706, 713 (Pa. Super. Ct. 2008)).

C

Because of the controlling precedent on what amounts to an "occurrence" under Pennsylvania law, our coverage analysis is straightforward. Our job is to "give effect" to the clear terms of the policies, so we will divide up the policies by the three definitions of "occurrence" and analyze them separately. *See Baumhammers*, 938 A.2d at 290 (quoting *Kvaerner*, 908 A.2d at 897).

1

Nineteen policies contain the Accident Definition of "occurrence"—the same definition that the Pennsylvania Supreme Court interpreted in *Kvaerner* and that we interpreted in *CPB* and *Specialty Surfaces*. *See Kvaerner*, 908 A.2d at 897; *CPB*, 562 F.3d at 594; *Specialty Surfaces*, 609 F.3d at 227. For these policies, we hold that the factual allegations in the Marvin Complaint do not amount to an "occurrence" that could trigger coverage.

At bottom, the Marvin Complaint alleged faulty workmanship. The core of Marvin's suit was that "[s]ome of the organically coated extruded aluminum profiles purchased by Marvin from Sapa did not perform as intended, represented, and agreed." App. 161. For example, "the surface finish of some of Marvin's windows and doors made with Sapa's

21

organically coated extruded aluminum profiles has prematurely failed in coastal installations in the field at an abnormal rate." App. 161. And as a result, Marvin asserted, it had racked up significant costs "in repairing and/or replacing Sapa's [products] which have experienced surface cracking, checking, peeling and/or loss of adhesion in installations in the field." App. 162.

Marvin's allegations do not amount to an "occurrence"—that is, an unforeseeable, "fortuitous event." *Specialty Surfaces*, 609 F.3d at 231; *Kvaerner*, 908 A.2d at 897–98. On this point, *Kvaerner* directly informs our analysis, even though "the workmanship involved here is a failure to perform quality control as to the product to be delivered rather than a failure to build a coke oven to the proper specifications." *CPB*, 562 F.3d at 596 (citing *Kvaerner*, 908 A.2d at 899). Put simply, it was "largely within [Sapa's] control whether it supplie[d] the agreed-upon product," so any liability flowing from Sapa's failure to deliver a product that met the agreed specifications was "too foreseeable to be considered an accident." *Id*.

Sapa protests this analysis, asserting that third-party property damage triggers coverage. But *CPB* and *Specialty Surfaces* both hold that any distinction between damage to the work product alone versus damage to other property is irrelevant so long as both foreseeably flow from faulty workmanship. *See CPB*, 562 F.3d at 597; *Specialty Surfaces*, 609 F.3d at 238–39. Sapa's briefing is silent on these cases. The bottom line is this: it was "certainly foreseeable that the product [Sapa] sold would be used for the purpose for which it was sold." *CPB*, 562 F.3d at 597. Marvin integrated Sapa's extrusions with its own products, and the eventual damage thus foreseeably exceeded the value of the extrusions themselves. We explained in *CPB* that "foreseeable acts which tend to exacerbate the damage, effect, or consequences caused *ab initio* by faulty workmanship also cannot be considered sufficiently fortuitous to constitute an 'occurrence' or

22

'accident' for the purposes of an occurrence-based CGL policy." 562 F.3d at 597 (citation omitted).[7]

Sapa also relies on *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189 (Pa. 2001), to argue that the District Court erred by not considering anecdotes of Sapa's interactions with some of the Insurers "in deciding the coverage issues." Appellant's Br. 46. We disagree. In general, *Sunbeam* says that "custom in the industry or usage in the trade" is relevant to explain the "special meaning or usage in a particular industry" of certain policy language. *See id.* at 500–01. For example, *Sunbeam* focused on specific wording that had "a peculiar usage in the insurance industry … that [was] different from the common usage of the terms." *Id.* at 502. But here, Sapa nowhere argues or offers any evidence that the insurance industry has a unique concept of what an "occurrence" is aside from how that term is defined in the policies and under controlling precedent.

To be sure, we interpret a policy's text "in light of … the performance of the parties under the contract." *AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 220 (3d Cir. 2009). Yet *admissible* course-of-performance evidence differs from *inadmissible* parol evidence: the former shows how the parties behave "under the contract"; the latter shows the "parties' pre-contract negotiations." *Id.* And the rule against parol evidence is firm. *See Resolution Trust Corp. v.*

---

[7] Sapa's reliance on *Pittsburgh Plate Glass Co. v. Fidelity & Cas. Co. of N.Y.*, 281 F.2d 538 (3d Cir. 1960), is misplaced. There, PPG sold paint to Columbia Air-O-Blind Co., which used the paint to coat its manufactured metal jalousies (outside venetian blinds). *Id.* at 539. Some of the paint was defective and flaked off the metal. *Id.* Columbia sued PPG, which tendered the claim to its insurer, Fidelity. *Id.* Fidelity refused to accept coverage, asserting that the alleged damage was not "physical injury" under PPG's liability policies. *Id.* at 540. We held that Fidelity had to provide coverage because once the paint was baked onto the metal, the paint became "part of the finished product." *Id.* at 541. Our decision in no part hinged on whether the underlying alleged damage was "fortuitous," as *Kvaerner* clarified the legal standard nearly fifty years later.

*Urban Redev. Auth. of Pittsburgh*, 638 A.2d 972, 975 (Pa. 1994). Sapa points to some parties' statements and actions related to Sapa's applications for CGL insurance. Appellant's Br. 47–50. This is pre-contractual parol evidence (albeit masquerading as a "course of performance"), and thus irrelevant to explain the written terms of the policies. *See Resolution Trust*, 638 A.2d at 975–76. Sapa also relies on some purported post-contractual data—for example, the supposed reasoning for certain premiums. Appellant's Br. 48. But, even assuming this would be admissible, none of Sapa's evidence can contradict the "unambiguous" Accident Definition of "occurrence" explained above. *See Gambone*, 941 A.2d at 711, 717.[8] Otherwise, parties could circumvent controlling precedent simply by acting as though it did not apply.

In sum, the factual allegations in the Marvin Complaint do not amount to an "occurrence" as that term is defined in the policies containing the Accident Definition. We will therefore affirm the District Court's judgment as it relates to these policies.

2

Seven policies contain the Expected/Intended Definition of "occurrence"—generally the National Union policies and those that follow form to them. Given this unique definitional language, we hold that the District Court should have considered these policies separately. We will vacate the District Court's decision as it relates to these policies and remand for further consideration.

As noted above, the primary difference between the Accident Definition and the Expected/Intended Definition is that the latter narrows the general category of "accident" by including only conditions that are "neither expected nor intended from the standpoint of the Insured." *E.g.*, App. 930. We will call this the "Insured's Intent Clause." The question is

---

[8] Charitably construed, Sapa's evidence shows only that the parties thought coverage would exist for some products-liability claims. Nobody disputes this. Everybody agrees that coverage would exist if conditions amounted to an "occurrence." The parties simply dispute what that term means, and Sapa's evidence sheds no light on that question.

whether the Insured's Intent Clause materially distinguishes these seven policies from the nineteen we analyzed above. We think it does.

First, we interpret insurance policies like other contracts—we "ascertain the intent of the parties as manifested by the [written] terms." *Baumhammers*, 938 A.2d at 290; *see Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999) ("Words of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense." (citation omitted)). So we must take care not to "violate the cardinal principle of interpretation that an insurance policy must be construed in such a manner as to give effect to all of its provisions." *Mut. of Omaha Ins. Co. v. Bosses*, 237 A.2d 218, 220 (Pa. 1968); *see 401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005).

With this in mind, we decline to interpret the Insured's Intent Clause as mere surplusage. If we held that the Accident Definition and the Expected/Intended Definition were synonymous, the Insured's Intent Clause in the latter would have no additional effect, thereby erasing it from seven policies.

Second, the Pennsylvania Superior Court has held that a liability policy containing the Expected/Intended Definition of occurrence was triggered when the underlying complaint asserted damages "arguably not expected" by the policyholder. *Indalex Inc. v. National Union Fire Ins. Co. of Pittsburgh*, 83 A.3d 418, 425 (Pa. Super. Ct. 2013). Indeed, the court explained that the definition of "occurrence" at issue there (the Expected/Intended Definition) diverged from the definition at issue in *Kvaerner* (the Accident Definition) by including "subjective language"—i.e., the Insured's Intent Clause. *See id.* at 424–25.[9]

---

[9] The Pennsylvania Superior Court later purported to clarify in unpublished dicta that *Indalex* did not "hinge[] upon the element of subjectivity in the underlying policy's definition of occurrence." *Hagel v. Falcone*, No. 614 EDA 2014, 2014 WL 8331846, at *12 (Pa. Super. Ct. Dec. 23, 2014). The court also noted that its language in *Indalex* was "difficult to reconcile" with *Kvaerner* and that, "in any event," *Indalex*'s

Third, in an analogous context, Pennsylvania law imbues the Insured's Intent Clause with a subjective-intent requirement. In *United Services Automobile Association v. Elitzky*, the Pennsylvania Superior Court interpreted a policy exclusion that precluded coverage for damage or injury "intended or expected by the insured." 517 A.2d 982, 984–85 (Pa. Super. Ct. 1986). The court held that this ambiguous provision turns on the insured's subjective intent, "exclud[ing] only injury and damage of the same general type which the insured intended to cause." *Id.* at 989 ("An insured intends an injury if he desired to cause the consequences of his act or if he acted knowing that such consequences were substantially certain to result."). The Pennsylvania Supreme Court and we have both endorsed *Elitzky*'s statement of the law. *See Minn. Fire & Cas. Co. v. Greenfield*, 855 A.2d 854, 863 (Pa. 2004); *Aetna Life & Cas. Co. v. Barthelemy*, 33 F.3d 189, 191 (3d Cir. 1994).

*Elitzky*'s subjective-intent standard diverges from the standard applied in *Kvaerner*, *CPB*, and *Specialty Surfaces*. Those cases applied an objective test of what constituted an "accident," explaining that claims for "faulty workmanship" were objectively not "fortuitous" enough to clear that bar. *See Kvaerner*, 908 A.2d at 898–99; *CPB*, 562 F.3d at 596–97; *Specialty Surfaces*, 609 F.3d at 238–39. In particular, *Kvaerner* expressed concern that any other holding would "convert a policy for insurance into a performance bond." *Kvaerner*, 908 A.2d at 899. *CPB* explained that "the failure to provide [a product as agreed-upon] is too foreseeable to be considered an accident." *CPB*, 562 F.3d at 596. And *Specialty Surfaces* added that "damages that are a reasonably foreseeable result of the faulty workmanship are also not covered under a commercial general liability policy." *Specialty Surfaces*, 609 F.3d at 239 (citations omitted). But none of those cases interpreted or

holding was mainly based on other grounds. *Id.* Yet *Indalex* was correct to recognize the differing language between the policies at issue there and in *Kvaerner*, especially considering the presumption against ignoring contractual language explained above. The Insurers' reliance on *Hagel* is thus misplaced. We find persuasive *Indalex*'s explanation that the "subjective language" of the Insured's Intent Clause may have a material effect on coverage. *See Indalex*, 83 A.3d at 424–25.

applied the Expected/Intended Definition of occurrence at issue here.[10] And thus none of those cases analyzed, or even considered relevant, the subjective intent and expectations of the insured.

For these reasons, we predict that the Pennsylvania Supreme Court would follow *Elitzky* and find that the Expected/Intended Definition of "occurrence" is ambiguous. *See Elitzky*, 517 A.2d at 989. We also predict that the Pennsylvania Supreme Court would construe the subjective-language against the insurer, holding that *Elitzky* should guide our interpretation instead of *Kvaerner*. So we hold that, under the Expected/Intended Definition, an "occurrence" includes those conditions not "of the same general type which the insured intended to cause." *Elitzky*, 517 A.2d at 989.

The District Court did not separately analyze these seven policies, grouping them instead with the cohort of Accident Definition policies. That was error, since courts must review and enforce insurance policies according to their terms. And the operative term of these seven policies—the Expected/Intended Definition of "occurrence"—is materially unique. So we will vacate the District Court's decision as it relates to these seven policies and remand for further consideration consistent with this opinion.

3

Two policies—the Liberty Mutual Policies—contain the Injurious Exposure Definition of "occurrence." As noted

---

[10] We recognize that *Kvaerner* equated an "accident" with something "unexpected"—i.e., "a degree of fortuity that is not present in a claim for faulty workmanship." 908 A.2d at 898. Yet nothing in *Kvaerner* suggests that the court thought "fortuity" should be measured subjectively. On the contrary, the court held that claims for faulty workmanship were categorically not fortuitous. *See id.* at 899. Under the Accident Definition at issue there, the court reasoned that including objectively foreseeable, but subjectively unintended damage in the definition of "occurrence" would create "an overly broad interpretation of accident." *Id.* at 899 n.9. *Kvaerner*'s holding is, on this question, limited to the text of the Accident Definition at issue there.

above, this definition is identical to the Expected/Intended Definition, except that it uses the term "injurious exposure" instead of "accident." The District Court did not analyze these policies separately, despite their unique wording. As a result, as with the seven policies containing the Expected/Intended Definition, and for many of the same reasons, we will vacate the District Court's decision as it relates to these two policies and remand for further individualized consideration consistent with this opinion.

\* \* \* \* \*

To sum up, the rule we reemphasize here is simple: in Pennsylvania, insurance policies must be interpreted and applied in accordance with their plain language and relevant Pennsylvania law. We believe that this rule best allows the parties to an insurance policy to structure their contractual relationship as they see fit.

As explained above, for the nineteen policies that contain the Accident Definition of "occurrence," under *Kvaerner*, *CPB*, and *Specialty Surfaces*, Marvin's allegations—which, at their core, are solely for faulty workmanship—do not trigger coverage. We will thus affirm the District Court's decision as it relates to these policies.

For the seven policies that contain the Expected/Intended Definition of "occurrence," we hold that the Insured's Intent Clause triggers the subjective-intent standard from *Elitzky*. We will vacate the District Court's decision as it relates to these policies and remand for further consideration consistent with this opinion.

And for the two policies that contain the Injurious Exposure Definition of "occurrence," since they also include the Insured's Intent Clause, we will vacate the District Court's decision and remand for further consideration consistent with this opinion.

To be clear, we take no position on whether Sapa may ultimately recover under any of the policies we are remanding to the District Court for more consideration. Given the extensive record and the amount in controversy, the parties should be afforded the opportunity to develop their coverage

28

arguments, including various theories of triggering conditions, under those policies before the District Court in the first instance.

V

For these reasons, we will affirm in part and vacate in part the District Court's decision and remand for additional consideration consistent with this opinion.