NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-2724

_____

SOLID STATE CHEMICALS LTD, and;
SOLID STATE CHEMICALS INC.

Appellants

v.

ASHLAND INC.

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 2-19-cv-1044)
District Judge: Honorable Marilyn J. Horan

_____

Submitted Under Third Circuit L.A.R. 34.1(a) on July 11, 2023

Before: SHWARTZ, RESTREPO, and CHUNG, *Circuit Judges*

(Opinion filed: October 25, 2023)

_____

OPINION*

_____

RESTREPO, *Circuit Judge*

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Appellants, Solid State Chemicals Ltd. and Solid State Chemicals Inc. (collectively, "Solid State"), appeal the District Court's decision which denied in part, and granted in part, each of the two respective cross-motions for summary judgment. Specifically, Solid State appeals the denial of Solid State's breach of contract claims, and the grant of two of the breach of contract counterclaims of Appellee, Ashland, Inc. ("Ashland"). Because the Court properly found in favor of Ashland and against Solid State on their aforementioned respective breach of contract claims, we affirm.

## I. FACTUAL BACKGROUND

The process of manufacturing solid maleic anhydride ("solid maleic") involves converting molten (liquid) maleic anhydride ("molten maleic") into solid maleic by pumping the molten maleic onto a machine called a pastillator which includes a metal roller or conveyer belt that cools and solidifies the molten maleic. The pastillator then breaks up the solid maleic into droplets, which are known as pastilles, after which the pastilles are conveyed to a bagger where they are packaged for shipment.[1] From approximately 2014 to 2017, Ashland supplied molten maleic to Solid State for the manufacture of solid maleic pastilles in Alabama.

---

[1] Maleic anhydride is a chemical intermediary primarily used to produce polyester resins which can be combined with fiberglass, for example, and used for such things as auto parts, boat hulls, and home construction items such as shower stalls. It can be harmful to the respiratory system and becomes increasingly hazardous upon repeated exposure. Therefore, it is subject to stringent Occupational Safety and Health Administration (OSHA) standards, as well as other industry standards, such as the American Conference of Governmental Industrial Hygienists (ACGIH) Threshold Limit Value (TLV), to protect workers from exposure.

In early 2017, the parties discussed moving Solid State's pastillation process to Ashland's facility in Neville Island, Pennsylvania. That same year, Ashland and Solid State negotiated and executed a Manufacturing Services Agreement (MSA), which became effective on November 1, 2017.[2]

Pursuant to the MSA, Ashland agreed to manufacture solid maleic exclusively for Solid State at Ashland's Neville Island facility. Under MSA section 2.10: "In the event that additional significant capital investments or equipment are required to meet production demands, the Parties will agree on an appropriate cost amortization or bailment agreement to be executed by the Parties and incorporated to this Agreement by reference." Appx. 96. The MSA further provides in section 2.9: "In no event will [Ashland] be required to perform any of its obligations under this Agreement in[:] (i) an unsafe or imprudent manner; (ii) contravention of [Ashland's] environmental, health and safety standards; or (iii) violation of applicable laws." *Id.*

Pursuant to the Parties' agreement, Solid State's pastillator and other equipment were installed at Ashland's Neville Island facility in late 2017. Ashland started the pastillator in 2018 and monitored indoor air quality for compliance with its internal Occupational Exposure Limit (OEL). Due to the fact that all personnel samples greatly exceeded its internal exposure limit, and all work areas were affected, Ashland put pastillator operations on hold in July 2018, and Ashland immediately took steps to protect workers and reduce exposures. Solid State accepted this plan as a prudent path forward.

---

[2] New York law governs construction and enforcement of the MSA.

Despite starting operations again with employees using personal protective equipment and other efforts to improve the safety of the operations, including authorizing $544,047 to purchase an autobagger and related expenses, indoor sampling in October 2018 continued to significantly exceed the ACGIH TLV. Indeed, despite efforts to improve safety, testing continued to show exceedances of the TLV, and on May 3, 2019, Ashland shut the line down because of identified safety concerns which posed a serious health risk to employees. Ashland thereafter asked Solid State to contribute to the cost of seven improvements that were identified as necessary before the pastillator could be restarted.

The MSA called for Ashland to invoice Solid State monthly, and payments were due within thirty days following the date of invoice. Ashland routinely invoiced Solid State for the pastilles made. Although Solid State had previously paid its invoices, it stopped paying invoices due after April 15, 2019.

In May 2019, there were discussions about the future of the pastillator line, and Solid State "initiated a discussion with Ashland about 'ways to pay Solid State as part of an exiting of the arrangement.'" Appx. 2326. On June 21, 2019, Solid State wrote Ashland alleging material default under the MSA and made a proposal of settlement with a demand that, among other things, Ashland purchase all of the physical assets of the pastillation production line at Neville Island. Solid State contends that Ashland breached the MSA because it unilaterally shut down production.

4

On July 1, 2019, Ashland then provided written notice to Solid State that Solid State materially defaulted under the MSA and that, unless Solid State engaged with Ashland to come to an agreement as to expenditures toward additional safety measures necessary to safely resume production, Ashland would formally terminate the agreement under MSA Section 9.2. On July 15, 2019, Solid State's counsel responded, reaffirming its position that Ashland was in breach because of its "unilateral decision to cease production." Appx. 2327. On July 31, 2019, Ashland wrote to Solid State confirming termination of the MSA. As the District Court pointed out, as of July 31, 2019, each party had declared material breach of the MSA, and neither party thereafter responded to the demands of the other.

Solid State has $237,500.95 in unpaid invoices. Further, Solid State has never removed its equipment and materials from Neville Island, as required under MSA section 9.5.

## II. PROCEDURAL HISTORY

In the District Court, Solid State's operative First Amended Complaint alleged breach of contract due to Ashland's failure to manufacture solid maleic. Ashland brought counterclaims for breach of contract, breach of duty of good faith and fair dealing, and a request for specific performance of Solid State's duty to remove its equipment and materials.

Following discovery, the parties filed cross-motions for summary judgment, and the District Court granted in part and denied in part each motion. In so doing, the Court

found Solid State breached the MSA in failing to pay the invoices due and failing to remove the equipment.  The Court also denied Solid State's claim of breach of contract when Ashland ceased production of solid maleic in light of the safety concerns, and the Court denied Ashland's claims that Solid State violated section 2.10 of the MSA.[3]  Solid State requested reconsideration of the Court's summary judgment order, and the Court reaffirmed its decision.[4]

## III.    DISCUSSION[5]

The District Court properly found in favor of Ashland on its counterclaim that

---

[3] In the District Court, Ashland contended that Solid State breached MSA section 2.10 by refusing to "participate in discussions with regard to expenditures needed for the pastillator line to safely produce solid maleic anhydride" and that "said breach and conduct also constitute[d] a breach of the implied covenant of good faith and fair dealing."  Appx. 19-20.  However, as the Court pointed out in concluding that neither party may recover under the provisions of MSA section 2.10, section 2.10 was not legally enforceable against either party under New York law as an "agreement to agree."  Appx. 20 (citing *Betty, Inc. v. Pepsico, Inc.*, 848 F. Appx. 43, 45 (2d Cir. 2021)); *see Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981) (It is "rightfully well-settled" under New York law "that a mere agreement to agree, in which a material term is left for future negotiation, is unenforceable.").

[4] The Court reserved for trial Ashland's claims for damages and specific performance regarding equipment removal, but the parties subsequently entered a joint stipulated judgment, accepted by the Court, that Ashland's damages for Solid State's failure to remove its equipment amounted to $150,000, and that the total damages when added to the $237,500.95 in unpaid invoices, were $387,500.95.

[5] The District Court had jurisdiction pursuant to 28 U.S.C. § 1332, and we have appellate jurisdiction under 28 U.S.C. § 1291.  "We review the District Court's grant of summary judgment de novo," applying "the same standards and presumptions as the District Court."  *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 249 (3d Cir. 2019).

Solid State breached the MSA by failing to pay invoices due.  Under New York law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance under the contract by one side; (3) breach of the contract by the other side; and (4) resulting damages.  *JP Morgan Chase v. JH Elec. of NY, Inc.*, 69 A.D.3d 802, 803 (N.Y. App. Div. 2010).

Section 3.2 of the MSA provides for the payment of invoices.  Concluding that Solid State breached its duty under section 3.2 of the MSA by failing to pay invoices, the District Court properly found that Solid State received nearly a quarter million dollars of pastilles, the pastilles met the MSA's specifications, Solid State was properly invoiced, and Solid State failed to pay the invoices due, totaling $237,500.95.

Solid State argues that its payment terms were orally modified by a conversation with a contact at Ashland.  However, as the District Court pointed out, even besides the fact that Ashland's contact specifically disagreed with Solid State's summary of this conversation, the content of the conversation recounted by Solid State contained no language indicating the alleged actual modification of the terms of the MSA.  Moreover, even assuming arguendo the record established any question of material fact as to any mutual intention to orally modify the MSA, which the District Court properly found it did not, the MSA specifically precludes amendment or modification except as defined by section 11.4.  MSA section 11.4 provides in relevant part: "No supplement, modification or amendment of the Agreement shall be binding unless in writing and executed by [Solid State] and [Ashland]."  Appx. 103.  It is undisputed no such writing exists.

7

Solid State further points to MSA section 3.2, which provides: "*Unless otherwise agreed between the Parties*, [Ashland] shall invoice [Solid State] on a monthly basis . . . Payments shall be due within thirty (30) days following the date of invoice."[6]  Appx. 96-97 (emph. added).  As explained, however, MSA section 11.4 further provides that any modification must be "in writing" and executed by the parties.  Appx. 103.

The District Court pointed out that New York law permits parties to "knowingly, voluntarily and intentionally" abandon their contract rights by waiver, by "affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." Appx. 18 (citing *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006) (internal citations and quotations omitted)).  The Court explained that "the presence of a non-waiver clause does not preclude a contract from being effectively modified by actual performance and the parties' course of conduct." Appx. 18 (quoting *1301 Prop. Owner LP v. Abelson*, 37 N.Y.S.3d 207 (N.Y. Sup. Ct. 2016)) (internal citations and quotations omitted).  However, as the District Court also found, here "the record demonstrates no evidence of a modification through actual performance . . . [or] through a course of conduct with regard to the regular payment of invoices." *Id.*

---

[6] We will assume arguendo that the "unless otherwise agreed" clause in section 3.2, which clearly relates to Ashland's invoicing, also relates to the due dates for Solid State's invoice payments, even though the sentence indicating the timing of Solid State's "payment due date" is a separate sentence following the one containing the "unless otherwise agreed" clause and Ashland's invoicing duties.

The District Court also properly found in favor of Ashland on its counterclaim that Solid State breached the MSA by failing to remove Solid State's equipment. Under MSA section 9.5, Solid State had a duty to remove all of its equipment from Ashland's Neville Island facility within 180 days of termination of the MSA. As explained, Solid State breached the MSA in failing to pay the invoices due pursuant to MSA section 3.2. Moreover, as the Court found, both parties gave notice of material default by the other and neither party moved to cure in response to the other's notice.[7] Indeed, "[t]here is no material question of fact that, following July 31, 2019, neither party acted in any way to challenge or question that the MSA was terminated." Appx. 25. It is undisputed that Solid State had a contractual obligation to remove its equipment after termination of the MSA. The Court properly found that Solid State's failure to do so was a breach of the contract.

Finally, having twice breached the MSA, as explained above, Solid State cannot maintain a claim for breach of contract under New York law. *See GTF Marketing, Inc. v.*

---

[7] Under the MSA, "'Material Default' means a breach of this Agreement causing a detriment of such severity for the aggrieved Party as to impede the receipt of substantial performance promised under the Agreement." Appx. 94. The District Court pointed out that "[s]aid breach [of Solid State's failure to pay invoices due] was a 'material default,' because it caused detriment to Ashland as to impede its receipt of payment in exchange for services performed as promised under the MSA." Appx. 25. Further, by the time of its July 15, 2019 letter to Ashland, Solid State was clearly alleging that Ashland's "decision to cease production" was a material default under the MSA, *see* Appx. 1831 ("Ashland's unilateral decision to cease production has caused significant damage to Solid State already and threatens the very destruction of the business."), and, by that time, Solid State was attempting to negotiate a resolution as a result of termination of the MSA.

*Colonial Aluminum Sales, Inc.*, 498 N.Y.S.2d 786, 788 (1985) (dismissing plaintiff's breach of contract claim because plaintiff was itself in breach). Moreover, Ashland did not violate the MSA when it stopped and did not resume commercial production because Ashland "had no duty to perform under the MSA to produce solid maleic anhydride when to do so was in contravention of Ashland's Industrial Hygiene and Occupational Health Standard Policy, environmental health and safety standards." Appx. 23. Here, the District Court properly concluded there was "no question of material fact that the provisions of MSA [s]ection 2.9 apply to relieve Ashland from performing its obligations under the MSA." [8] Appx. 22; *see* Appx. 96 ("In no event will [Ashland] be required to perform any of its obligations under this Agreement in . . . contravention of [Ashland's] environmental, health and safety standards.").

Because the District Court correctly granted summary judgment in favor of Ashland on its counterclaims for breach of contract due to Solid State's failure to pay invoices due and failure to remove Solid State's equipment, and the Court correctly denied Solid State's claims for breach of contract, we affirm.

---

[8] As Ashland points out, since Solid State did not argue anticipatory repudiation in the District Court, that argument is waived. *See DIRECTV, Inc. v. Seijas*, 508 F.3d 123, 125 n.1 (3d Cir. 2007) ("It is well established that arguments not raised before the [d]istrict [c]ourt are waived on appeal."); *Brenner v. Local 514 United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1298 (3d Cir. 1991) ("It is well established that failure to raise an issue in the district court constitutes a waiver of the argument."); *see also John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("arguments raised in passing . . . but not squarely argued, are considered waived"). Thus, Solid State is precluded from raising the argument on appeal.