PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-1498
_____

AMERICAN HOME ASSURANCE COMPANY,
                                                        Appellant

v.

SUPERIOR WELL SERVICES, INC.
_____

On Appeal from the United States District Court
For the Western District of Pennsylvania
(D.C. No. 2-16-cv-01065)
District Judge:  Honorable David S. Cercone
_____

Argued
April 26, 2023

Before:   JORDAN, KRAUSE and BIBAS, *Circuit Judges*

(Filed: July 25, 2023)
_____

Devin Adams
Arnold & Porter Kaye Scholer
700 Louisiana Street – Ste. 1600
Houston, TX 77002

Robert R. Anderson   [ARGUED]
Arnold & Porter Kaye Scholer
1144 Fifteenth Street – Ste. 3100
Denver, CO 80202

*Counsel for Appellant*

Michael G. Connelly
Troutman Pepper
501 Grant Street
One Oxford Centre – Ste. 300
Pittsburgh, PA 15219

Ralph C. Surman, Jr.
Morgan Lewis & Bockius
301 Grant Street
One Oxford Centre – Ste. 3200
Pittsburgh, PA 15219

Misha Tseytlin   [ARGUED]
Troutman Pepper
227 W. Monroe Street – Ste. 3900
Chicago, IL 60606

     *Counsel for Appellee Superior Well Services Inc.*

William A. Ciszewski   [ARGUED]
Hodgson Russ
140 Pearl Street
The Guranty Building – Ste. 100
Buffalo, NY 14202

     *Counsel for Intervenor-Appellee US Energy
     Development Corp*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

American Home Assurance Co. ("American Home") appeals the District Court's order granting summary judgment for policy holder Superior Well Services, Inc. ("Superior"). Specifically, American Home contends that the insurance policy it issued to Superior does not indemnify the latter for property damage caused by Superior's own faulty workmanship. We agree and we will reverse the District Court's order, remanding with directions to enter judgment for American Home.

## I. BACKGROUND

### A. The Underlying State Law Claim

This dispute stems from an underlying New York state-law claim brought by U.S. Energy Development Corporation[1] ("U.S. Energy") against Superior. From June 2005 to October 2007, U.S. Energy contracted with Superior for hydraulic fracking services to extract natural gas from wells owned by U.S. Energy. In October 2007, U.S. Energy advised Superior that it believed Superior had damaged some of these wells during the fracking process.[2] Accordingly, in November 2007, Superior notified its insurance provider, American Home, about the potential claim. In February 2008, American Home agreed to provide Superior with defense counsel, but it also

---

[1] U.S. Energy is an Intervenor-Defendant-Appellee in this action. Superior is a Chapter 11 Debtor in a bankruptcy reorganization, *In re CJ Holding Co.*, No. 16-33590 (Bankr. S.D. Tex., Houston Div.), and U.S. Energy has filed a proof of claim in that matter.

[2] According to U.S. Energy, Superior improperly used certain chemical mixtures during the fracking process, mixtures that were "defectively designed, were [unfit for] stimulating the production of natural gas wells[], were used in improper concentration or ratios, were used in geologic formations for which they were not fit, were improperly manufactured, stored, handled or applied, or were improperly used with incompatible materials, incompatible water, or incompatible geology." (App. at 74.) As a result, the damaged wells produced diminished amounts of natural gas.

sent Superior a letter reserving its right to contest insurance coverage.

In September 2010, U.S. Energy filed the underlying lawsuit against Superior in New York state court, alleging that Superior had damaged 97 of its wells. The case proceeded to trial in April 2018, with American Home providing Superior's defense. The jury considered only whether Superior had breached its agreement with U.S. Energy "to render services in a reasonably careful and professional manner[.]" (App. at 75.) The trial court instructed the jury that, if it found "that Superior breached the contract by failing to perform services with reasonable care, skill and diligence" and "that U.S. Energy suffered damages as a result, [it should] find for U.S. Energy on its breach of contract claim[.]" (App. at 326-27.)

In May 2018, the jury found against Superior on the breach of contract claim and determined that Superior had damaged 53 of the 97 wells. The jury's verdict form specified that Superior "fail[ed] to perform its contract with U.S. Energy in a workman like manner" and that this "failure" was "a substantial factor in causing damage to the U.S. Energy wells[.]" (App. at 336.) Accordingly, it awarded U.S. Energy $6.16 million, a figure that was increased to approximately $13.18 million after the state court tabulated interest.

### B. The Dispute Between Superior and American Home

Before the unfortunate misperformance of its duties to U.S. Energy, Superior purchased four commercial general liability ("CGL") policies from American Home, one for each of the years 2004–2005, 2005–2006, 2006–2007, and 2007–

5

2008. Superior's policy provided coverage for "property damage" arising out of an "occurrence."[3] (App. at 352.) The policy defined "property damage" as both "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not physically injured." (App. at 366.) It defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions[,]" but it did not define the term "accident." (App. at 365.) The policy further contained exclusions, one of which excluded coverage for all damage to "[p]ersonal property in the care, custody or control of the insured[.]" (App. at 355.)

Superior also purchased an "underground resources and equipment coverage" ("UREC") endorsement that amended the CGL policy to provide additional coverage "against risks associated with well-servicing operations[.]" (Answering Br. at 7.) Specifically, the endorsement "added" coverage "with respect to 'property damage' included within the 'underground resources and equipment hazard' arising out of the operations performed by [Superior] or on [Superior's] behalf[.]" (App. at 374.) The UREC endorsement defined "[u]nderground resources and equipment hazard" as "property damage" to any of the following:

---

[3] The policies Superior bought each year were materially identical except that the limit for "each occurrence" under the policy was increased from $1 million to $2 million in the 2007-08 policy. (App. at 587.) This opinion cites to the 2004–05 policy.

6

a. Oil, gas, water or other mineral substances which have not been reduced to physical possession above the surface of the earth or above the surface of any body of water;

b. Any well, hole, formation, strata or area in or through which exploration for or production of any substance is carried on;

c. Any casing, pipe, bit, tool, pump or other drilling or well servicing machinery or equipment located beneath the surface of the earth in any such well or hole or beneath the surface of any body of water.

(App. at 375.)

In July 2016, American Home filed this diversity action seeking a declaratory judgment that Superior's policy does not indemnify Superior for any damages that might be awarded to U.S. Energy and which were caused by Superior's breach of contract. American Home argued below – and now argues on appeal – that property damage caused by a failure to perform a contract "in a workman like manner" is not an "occurrence" under the policy. (Opening Br. at 20.) It further argued that, even if the policy covered Superior's insurance claim, the claim would involve a single "occurrence" under Pennsylvania law, as opposed to 53 separate occurrences, and is thus subject to the policy's $2 million per-occurrence limit. U.S. Energy intervened as a defendant and counter-claimed for a declaration that American Home has a duty to indemnify Superior. It argued that the plain text of the endorsement, which modified the standard CGL policy, expressly covers the judgment awarded to U.S. Energy and that the 53 instances of

7

well damage were separate "occurrences." Each of the parties then moved for summary judgment.

## C.      The District Court's Opinion

The District Court granted summary judgment for Superior and, by extension, for U.S. Energy, and it ordered American Home to indemnify Superior for the state court judgment. It first determined that the policy's "occurrence" provision was "irrelevant" because, in its view, the UREC endorsement covered Superior's fracking operations regardless of whether Superior's liability was caused by its own failure to perform the contract "in a workman like manner." (App. at 16-20.) Additionally, and alternatively, while recognizing that the Pennsylvania Supreme Court has held that the term "occurrence" does not cover "faulty workmanship," the District Court distinguished that language from the phrasing of the jury's verdict sheet, which stated that Superior "fail[ed] to perform its contract with U.S. Energy *in a workman like manner*[.]" (App. at 336 (emphasis added).) Finally, the Court concluded that each of the 53 damaged wells gave rise to a separate occurrence, triggering an independent coverage limit for each respective well.

## II.      DISCUSSION[4]

Setting aside for the moment the question of whether the UREC endorsement displaces the insurance policy's

---

[4] The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291. We review summary judgment decisions de novo, applying the same standard as the district court was obligated to apply. *Sapa*

"occurrence" requirement, it is readily apparent that the damage to U.S. Energy's wells was not caused by an "occurrence." In *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, a steel company hired Kvaerner to construct a coke oven battery. 908 A.2d 888, 891 (Pa. 2006). The steel company alleged that the battery did not meet the contract's specifications and sued Kvaerner for breach of contract. *Id.* Kvaerner notified its insurer, which disclaimed coverage, leading Kvaerner to file a declaratory judgment action. *Id.* at 891-92. Like the insurance policy in this case, the policy in *Kvaerner* defined "occurrence" as an "accident" but did not define the word "accident." *Id.* at 897. The court relied on the ordinary dictionary meaning of "accident": "'[a]n unexpected and undesirable event,' or 'something that occurs unexpectedly or unintentionally.'" *Id*. at 897-98 (quoting Webster's Second New College Dictionary 6 (2001)). "The key term" in that definition, the court explained, is "unexpected," which "implies a degree of fortuity that is not present in a claim for faulty workmanship." *Id.* at 898.

---

*Extrusions, Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 249 (3d Cir. 2019). Under Pennsylvania law, which the parties agree governs our interpretation of the insurance policy at issue, the interpretative task "is generally performed by a court rather than by a jury." *401 Fourth Street, Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005) (internal quotation marks and citation omitted). "When the language of an insurance policy is plain and unambiguous, a court is bound by that language." *Pa. Nat'l Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014).

In affirming a grant of summary judgment that denied coverage to Kvaerner, the Supreme Court of Pennsylvania stated:

> We hold that the definition of "accident" required to establish an "occurrence" under the policies cannot be satisfied by claims based upon faulty workmanship. Such claims simply do not present the degree of fortuity contemplated by the ordinary definition of "accident" or its common judicial construction in this context. To hold otherwise would be to convert a policy for insurance into a performance bond. We are unwilling to do so, especially since such protections are already readily available for the protection of contractors.

*Id.* at 899 (internal footnote omitted).

Similarly, in *Sapa Extrusions, Inc. v. Liberty Mutual Insurance Co.*, we concluded that faulty workmanship did not amount to an "occurrence" defined as an "accident" under the CGL policy at issue in that case. 939 F.3d 243, 256 (3d Cir. 2019). There, Sapa supplied "organically coated extruded aluminum profiles" to a company that manufactured windows and doors using those profiles. *Id.* at 246. The manufacturer contended that Sapa's aluminum profiles "did not perform as intended, represented, and agreed." *Id.* at 256. The manufacturer sued Sapa, whose insurers disclaimed coverage. *Id.* at 248. Observing that "*Kvaerner* directly informs our analysis," we held that the breach of contract that "flow[ed] from faulty workmanship" did not amount to an "'occurrence' – that is, an unforeseeable, 'fortuitous event.'" *Id.* at 256. In

10

other words, it was "largely within Sapa's control whether it supplied the agreed-upon product, so any liability flowing from Sapa's failure to deliver a product that met the agreed specifications was too foreseeable to be considered an accident." *Id.* (cleaned up).

Although the District Court in this case indicated that "faulty workmanship" might be different from a failure to perform a contract "in a workman like manner,"[5] the Supreme Court of Pennsylvania's holding in *Kvaerner* – and our application of *Kvaerner* in *Sapa* – were premised on the logic that poor workmanship is too "foreseeable to be considered an accident," rather than on labels or special words. *Id.* The phrases "faulty workmanship" and "failure to perform in a workman like manner" are equivalent in this respect. And, under Pennsylvania law, faulty workmanship, such as rendering a substandard service or causing damage by use of an unsuitable product, as was the case here, does not constitute an "occurrence" when an insurance policy defines an "occurrence" as an "accident." *Kvaerner*, 908 A.2d at 897-98.

Returning to the question of whether the UREC endorsement eliminates the policy's "occurrence" requirement, we conclude that the policy and endorsement are best read together as retaining the requirement. The District Court held that the endorsement "either expands or supersedes the [underlying policy's] definition of occurrence" and

---

[5] The Court expressly declined "to decide whether 'faulty workmanship' and 'workman like manner' are equivalent phrases[,]" but the analysis it undertook distinguished *Kvaerner* and *Sapa* and their focus on faulty workmanship. (App. at 19 & n.3.)

11

provides coverage for any damage that both falls within the definition of "underground resources and equipment hazard" and "aris[es] out of the operations performed by" Superior. (App. at 22–23.) Although it is true that the language of an endorsement would supersede that of an underlying policy if the two were in conflict, that is not the case here.

First, the underlying policy excluded coverage for damage to all "[p]ersonal property in the care, custody or control of the insured." (App. at 354-55.) Therefore, absent the UREC endorsement, damage to personal property used in connection with servicing the wells and within Superior's care, custody or control would have been excluded from the policy. (App. at 374-75.) The endorsement, however, reinstates that coverage by providing that the "exclusion does not apply to any 'property damage' included within the 'underground resources and equipment hazard[.]'" (App. at 375.) The endorsement defines "[u]nderground resources and equipment hazard" to "include[] 'property damage'" to oil and gas wells and "[a]ny casing, pipe, bit, tool, pump or other drilling or well servicing machinery or equipment located beneath the surface of the earth in any such well[.]"[6] (App. at 375.) Notably, to

---

[6] Indeed, this equipment likely would have constituted personal property under Pennsylvania law as trade fixtures, so the endorsement restored coverage for damage (caused by an occurrence) to certain items that otherwise would have fallen outside of the underlying policy. *See Haut v. Carlson*, 71 Pa. D. & C.2d 748, 749 (Pa. Ct. Com. Pl. 1975) ("[T]he casing in an oil or gas well as well as the derrick and other appliances used in drilling are trade fixtures and may be removed by the owner or lessee either during the term of the lease or within a reasonable time after its expiration."); *accord* 39 A.L.R. 1255

12

trigger coverage, the endorsement expressly requires "property damage," which, under the underlying policy, is covered only if it "is caused by an 'occurrence.'" (App. at 352.) The endorsement then, instead of conflicting with the terms of the underlying policy, incorporates the "occurrence" requirement by way of the "property damage" requirement.

Second, there are other places in the endorsement that either cross-reference the underlying policy or expressly use the term "occurrence." The endorsement's Provision A creates a new aggregate limit for coverage and states that the new limit "is the most we will pay under Coverage A [of the underlying agreement] for the sum of damages because of all 'property damage' included within the 'underground resources and equipment hazard' and arising out of operations in connection with any one well." (App. at 374.) Next, Provision A provides that it is "subject to [Paragraph] 5" of Section III of the underlying policy, and Paragraph 5 of the underlying policy establishes policy limits that are "the most [American Home] will pay … because of all 'bodily injury' and 'property damage' arising out of any one 'occurrence.'" (App. at 361.)

---

(originally published in 1925) ("There is considerable authority for the view that the lessee of an oil or gas well has the absolute right to remove casing which he has installed in the well …. based upon the ground that the casing is a trade fixture or personal property, rather than a permanent fixture or part of the realty, and that it can be removed without injury to the land."); *see also Fixture*, *Black's Law Dictionary* (11th ed. 2019) (defining "trade fixture" as "[r]emovable personal property that a tenant attaches to leased land for business purposes").

And Provision D of the endorsement imposes certain duties on the insured "[u]pon the 'occurrence'" of certain types of damages. (App. at 375.) The endorsement's cross-reference to the underlying policy and use of the term "occurrence" therefore suggest that the endorsement incorporates, rather than eliminates, the "occurrence" requirement.

Third and finally, no provision in the endorsement implicitly, let alone expressly, repudiates the "occurrence" requirement. As a matter of structure, it makes sense that the UREC endorsement would amend but not eliminate key terms in the underlying policy, because only the latter functions as an independent insurance agreement that promises to "pay those sums that the insured becomes legally obligated to pay as damages[.]"[7] (App. at 352.)

---

[7] Superior also asserts that American Home is barred under Pennsylvania's estoppel doctrine from asserting its "occurrence" requirement argument because, Superior alleges, American Home did not provide Superior notice of that argument until eight years after November 2007, when Superior first informed American Home about U.S. Energy's potential claim against it. On the contrary, however, American Home informed Superior in February 2008 – in its first reservation of rights letter – that American Home "reserves its rights" as to "whether the claimed damage arose out of an 'occurrence' as defined by the policy and applicable law." (App. at 265.) Moreover, Superior did not articulate in its briefing any detrimental reliance due to the purported lack of notice. American Home was therefore not estopped from asserting its "occurrence" requirement argument because it "timely" and "fairly inform[ed] the insured of the insurer's

14

We therefore hold that the endorsement does not displace the underlying policy's occurrence requirement. Because we also hold that the damage caused by Superior's failure to perform its contract "in a workman like manner" is not an "occurrence" under Pennsylvania law, we do not reach the question of whether the insurance claim here involves 53 separate occurrences or a single occurrence.

## III.   CONCLUSION

For the foregoing reasons, we will reverse the District Court's summary judgment order and remand with instructions to enter judgment for American Home.

---

position[.]" *Erie Ins. Exch. v. Lobenthal*, 114 A.3d 832, 837 (Pa. Super. Ct. 2015).